## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| GOLD STANDARD BAKING, LLC, *et al.*,[1] | Case No. 22-10559 (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF JOHN T. YOUNG, JR.,
## CHIEF RESTRUCTURING OFFICER OF GOLD STANDARD BAKING, LLC,
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, John T. Young, Jr., hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of Gold Standard Baking, LLC, an Illinois limited liability company ("GSB"), along with its affiliated debtors and debtors in possession, Gold Standard Holdings, Inc., a Delaware corporation ("Holdings"), and Gold Standard Real Estate, LLC, a Delaware limited liability company ("GS Real Estate" and together with GSB and Holdings, collectively the "Company" or the "Debtors").[2]

2.      I am currently a senior managing director at Riveron Consulting, LLC ("Riveron"). I am responsible for leading Riveron's restructuring practice in the Houston office. Previously, I worked at an international private equity fund generally known as Lone Star Funds and in the assurance services practice at KPMG Peat Marwick, LLP.  I earned a B.A. and M.B.A. from Baylor University, and I am a Certified Public Accountant, Certified Turnaround Professional, Certified

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Gold Standard Baking, LLC (8756); Gold Standard Holdings, Inc. (0787); and Gold Standard Real Estate, LLC (6528). The location of the Debtors' service address is 3700 S Kedzie Avenue, Chicago, Illinois 60632.

[2]      A chart depicting the Debtors' organizational structure is attached hereto as **Exhibit A**.

Insolvency and Restructuring Advisor, and Certified in Financial Forensics by the American Institute of Certified Public Accountants.

3.      As Chief Restructuring Officer, I am responsible for the Debtors' overall strategic direction and operations. I have more than 20 years of involvement in the restructuring sector, which includes extensive experience serving chapter 11 debtors in interim leadership positions, including those of Chief Restructuring Officer, Chief Executive Officer, and Chief Financial Officer.  I have significant advisory experience involving debtors in chapter 11, and I have been qualified as an expert in other bankruptcy proceedings.

4.      I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records. I submit this declaration to assist the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and parties in interest in better understanding the circumstances leading to the commencement of these chapter 11 cases and in support of the relief that the Debtors have requested pursuant to the motions and applications filed on the first day of these cases.

5.      Except as otherwise indicated herein, all facts in this declaration are based upon my personal knowledge, my discussions with the management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge. I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this declaration.

## THE DEBTORS' CORPORATE HISTORY AND OPERATIONS

**A.      Overview of the Debtors' Operations and Services.**

6.      The Debtors are one of the largest industrial bakers in the United States, specializing in croissants and a variety of other laminated dough-based sweet goods. The Debtors'

bakery is located in Chicago, Illinois (the "Chicago Facility") and, until recently, ran a second bakery in Pleasant Prairie, Wisconsin (the "Wisconsin Facility"). The Debtors produce over 1.7 million pounds of fully-baked goods per week on average, including approximately 100 varieties of fully-baked croissants, Danishes, and cinnamon rolls.  These goods are delivered to approximately 100 retail and other foodservice customers per week through a network of distributors.  The Debtors offer fully-finished "thaw and serve" foods designed for ease of use to customers across a wide range of industries, including partners in food service, retail, casual dining, health, education, and quick service restaurants.

**B.      History.**

7.      Founded in 1987, the Company began as a neighborhood, family-run bakery that has since grown into a world-class baked goods supplier. The Company expanded over the last several decades. In 2004, the Company bought its first industrial croissant production line, allowing the Company to more efficiently produce its signature croissant product. The Company also expanded into the danish pastry business in 2006, increasing its production capabilities and market reach. In 2008, Arbor Investments acquired a controlling interest in the Company and invested $40 million in new equipment and facility updates. These investments allowed the Company to acquire two additional production machines in 2008 and 2012 and increase its production capacity exponentially to become one of the largest manufacturers of croissants and danishes in the United States.

8.      The Company began to explore further growth opportunities, and in 2015, ran a marketing process which led to the Company's acquisition by an investor group led by Parallel49 Equity ("P49"). From 2015 to 2017, the Company experienced strong recurring sales driven by relationships with flagship food service and retail accounts across both the croissant and danish product categories. These growing EBITDA margins were due to equipment utilization rates at the

3

Chicago Facility that, while leading to high profitability, were not sustainable on a go-forward basis. As a result, and in response to increasing customer demand and capacity constraints, the Company commissioned a $50 million expansion plan to add 27,000 square feet of production space in Chicago and open the Wisconsin Facility.

9.      In 2016, the Company began the expansion of the Chicago Facility, and, shortly thereafter, in 2017, opened the facility in Pleasant Prairie, Wisconsin, increasing the Company's annual croissant capacity by over 30 million pounds.  By and large, the capabilities to produce high-quality baked goods at scale allowed the Company to grow its market share and develop a long list of national customers.

10.     As discussed further herein, the Company experienced significant disruptions to its workforce beginning in 2017, which permeated all aspects of the business, including its production rates and customer relations. The Company made significant strides to repair relationships with its customers and restore its production capacity and quality control. However, the COVID-19 pandemic presented new labor challenges for the Company to tackle, further increasing pressure on the Company's financials.

11.     In September 2018, the Company hired Haq Chaudary, a baking industry veteran, as Vice President and General Manager to address recent challenges and bolster the Company's sales and marketing efforts. The Company promoted Mr. Chaudary to Chief Commercial Officer in May 2019. Under Mr. Chaudary's direction, the Company implemented annual pricing reviews with customers, formal pipeline tracking, and the development of a formal new account acquisition strategy. The Company continued its focus on strengthening its management team over the last several years, including appointing Mr. Chaudary to Chief Executive Officer in 2021.

**C.      Scope of Operations.**

12.      The Company is the leading croissant supplier in the United States. Producing approximately 65 million pounds of croissants a year.  The Company also produces danishes and cinnamon rolls and has the production capacity of approximately 23 million pounds of other baked goods.

13.      The Company offers a wide variety of goods, in varying formats and markets and produces croissants for food service, convenience stores, commissaries, and other retail outlets, as well as danishes and cinnamon rolls for grocery store in-store bakeries. Due to the Company's resources and manufacturing expertise, it is able to rapidly scale a new product launch as a given customer's demand grows, placing it in an excellent position for future growth.

14.      The Company's scale offerings have made it a trusted strategic partner for national restaurant chains, retail brands, and grocery chain operators. Additionally, the Company's fully-finished products are ideal for large chain and retail partners, as its thaw and serve offerings are easier for customers to utilize when compared to products that require other baking techniques. Rising labor costs and reduced labor availability, in addition to the skilled labor required to mix, proof, bake, and decorate baked goods, contributed to a shift towards fully-finished products across industries. Fully-finished products lower labor cost, have a longer shelf life, and reduce waste. They also simplify execution at the store and restaurant level, reduce space demands, and provide consistent quality to the final consumer.

15.      Additionally, the laminated dough manufacturing process is more complex than the manufacturing process for the majority of other value-added baked goods, placing the Company, with its institutional knowledge and established infrastructure, in an enviable position in the market. Lamination, or the process of folding butter into dough multiple times to create alternating layers of butter and dough, is the basis for both croissants and danishes, and is significantly more

difficult to scale than processes for other baked goods. The process requires strict temperature and environmental controls that can vary based on operating conditions. The Company's manufacturing facilities are equipped to regulate the temperature of the dough and fat ingredients throughout the production process from the first mixing of the dough to the final proofing. The Company is therefore better equipped to take on new business and increase scale to address customer demands than its competitors.

16.    In 2020, the Company launched two new brands—37th Street and Miss Emmie's Danish and Cinnamon Roll—to expand its product offerings beyond the classic croissant, positioning the Company for future growth and additional volume in the retail and in-store bakery market.  New customer relationships have provided the Company with an opportunity to expand its distribution under its own brand through a network that includes varying markets and customer sizes. The Company continues to seek out new opportunities for growth.

**D.    Critical Components of the Debtors' Cost Structure.**

**1.    Employee Compensation and Benefits.**

17.    As of the Petition Date, the Debtors employ approximately 333 full-time employees. The Debtors also periodically retain temporary workers through various staffing agencies to fulfill certain duties on a short- and long-term basis. Typically, at any given time the Debtors retain approximately 50 temporary staff.

18.    Approximately 12% of the employees are compensated on a salary basis and the remaining employees and all the temporary workers are compensated on an hourly basis. As of the Petition Date, approximately 262 employees are represented by the Chicago and Midwest Regional

Joint Board Affiliated with Workers United/SEIU (the "Union").[3] The represented employees are employed by the Debtors in the Chicago Facility and are comprised of full- and part-time production, sanitation, maintenance, and dock workers.

19.     The Debtors offer their employees the opportunity to participate in a number of insurance and benefits programs, including those related to health insurance, retirement benefits, workers' compensation benefits, life insurance, short- and long-term disability insurance coverage, non-insider severance, and certain other benefits. The Debtors' average weekly gross employee compensation in 2022 is approximately $400,000. The Debtors anticipate that their monthly gross employee compensation will range from approximately $1,520,000 to $1,800,000 during these chapter 11 cases.

### 2.     Sales and Marketing Expenses and Other Administrative Costs.

20.     Key components of the Debtors' cost structure include corporate operating expenses related to marketing and product development, and sales, general, and administrative expenses. Through year to date ending April 30, 2022, on a consolidated basis, the Debtors recorded approximately $1.2 million in sales and marketing expenses, and approximately $1.6 million in general and administrative expense, totaling approximately $2.8 million as compared to approximately $29.9 million in gross sales and $26.8 million in sales net of distribution costs and discounts. These marketing expenses are critical to the business. They entail salaries and wages, marketing programs and commissions, and other miscellaneous advertising and sales promotion related expenses.

---

[3]     Gold Standard Baking, LLC is party to a collective bargaining agreement with the Union effective as of April 1, 2021.

21.     As discussed herein, the Debtors have made significant efforts to reduce these costs and increase profit margins in recent years, and plan to continue value-constructive cost reduction going forward to optimize estate value for all stakeholders.

**3.      Supply Agreements and Raw Materials.**

22.     The Debtors purchase certain ingredients—including flour and fats, packaging, and utilities through various contracts with suppliers. These agreements provide stability and visibility for the cost of raw materials. The Debtors have long-standing relationships with their suppliers and, to date, have never experienced a material supply disruption.

23.     The Debtors' raw materials are a significant expense. Through year to date ending June 4, 2022, the Debtors spent approximately $11.6 million on materials such as ingredients and packaging. Ingredients and other raw materials are a critical component of the Company's business, and the Debtors depend on their suppliers to support the Company's ongoing operations.

**4.      Equipment Repair and Maintenance.**

24.     Maintenance of the Debtors' machinery and equipment is a substantial expense that has continued to rise in recent years due to the age of the Debtors' machinery. As time goes on, regular equipment maintenance is crucial to sustaining production volumes and avoiding delays in deliveries to customers. Through year to date ending April 30, 2022, the Debtors spent $570 thousand on repairs and maintenance of machinery and other equipment at each of their facilities. Most of the Debtors' equipment is now older, and maintenance is increasingly a burden on capital expenditures.

**5.      Lease Obligations.**

25.     The Debtors lease the Chicago Facility through a triple-net lease that runs through 2038. The Chicago Facility is 189,000 square feet with four production lines and approximately 335 employees. The total rent per year is approximately $1.5 million and requires approximately

8

$0.8 million in annual capital expenditures and maintenance. It produces approximately 65 million pounds of croissants and 22 million pounds of danishes and other products annually. The facility has the capacity to increase production by adding an additional shift and increasing hourly manufacturing line run-time across production lines.

26.     Generally, under this lease, the Debtors pay the taxes, insurance, and maintenance expenses related to the leased space.  The Debtors also lease certain of their equipment, which costs approximately $0.2 million per year.

## THE DEBTORS' PREPETITION CORPORATE AND CAPITAL STRUCTURE

27.     As of the Petition Date, the Debtors' capital structure consists of outstanding funded debt obligations in the aggregate principal amount of approximately $140 million, including the Revolving Credit Facility, the First Lien Term Loan, the Second Lien Term Loan, and the Senior Subordinated Notes, each as defined below, and preferred equity units (the "Preferred Equity Units") and fully diluted common equity units (the "Common Equity Units," and, together with the Preferred Equity Units, the "Equity Units").

28.     The following table summarizes the Debtors' outstanding funded debt obligations as of the Petition Date:

| Funded Debt | Maturity | Interest Rates[4] | Principal Amount Outstanding |
|---|---|---|---|
| **Revolving Credit Facility** | July 23, 2022 | Base Rate + 3.5% per annum (additional 2% Payment-In-Kind) | $15,002,210 |
| **First Lien Term Loan** | July 23, 2022 | Base Rate + 3.5% per annum (additional 2% Payment-In-Kind) | $73,760,555 |
| **Second Lien Term Loan** | January 23, 2023 | 20.00% (Payment-In-Kind) | $16,311,835 |
| **Senior Subordinated Notes** | January 23, 2023 | 2.00% (Payment-In-Kind) | $35,470,906 |
| **TOTAL** | | | $140,545,505 |

### A.    The Revolving Credit Facility and the First Lien Term Loan.

29.    GSB is borrower, with Holdings and GS Real Estate as guarantors, under that certain credit agreement, dated as of April 24, 2015 (as amended, restated, amended and restated, supplemented, or otherwise modified, the "First Lien Credit Agreement"), by and among the Debtors and BNP Paribas, as administrative agent (the "Agent") and the lenders party thereto (the "Initial Lenders"), and BNP Paribas Securities Corp. as sole lead arranger and sole bookrunner. The First Lien Credit Agreement is secured by a first priority lien on substantially all of the Debtors' assets as more particularly described in the First Lien Credit Agreement and the related loan documents (together, the "First Lien Documents"). Under the First Lien Credit Agreement, the Debtors had access to a $30,000,000 revolving facility with a maturity date of July 23, 2022 (the "Revolving Credit Facility"). Commitments under the Revolving Credit Facility terminated pursuant to that certain Sixth Amendment to Credit Agreement and Limited Waiver, dated as of September 25, 2019. The First Lien Credit Agreement also provides for a $109,000,000 term loan with a maturity date of July 23, 2022 (the "First Lien Term Loan"). Interest is payable under the

---

[4]    "Base Rate" means, for any day, a rate per annum equal to the greatest of (i) the prime rate, (ii) the federal funds effective rate plus one-half of 1.0%, and (iii) adjusted LIBOR a one-month interest period plus 1.0%.

Revolving Credit Facility and First Lien Term Loan quarterly in arrears, on the final date of each fiscal quarter (*i.e.*, March 31, June 30, September 30, or December 31).

30.     The Company has been in default under the First Lien Documents which led to a series of forbearance agreements beginning in 2020 (each, a "<u>Forbearance Agreement</u>" and collectively, the "<u>Forbearance Agreements</u>"), the latest of which was dated as of July 2, 2021. Pursuant to the Forbearance Agreements, the Agent and Initial Lenders agreed to, among other things, forbear from exercising certain rights and remedies under the First Lien Credit Documents for a limited period of time, subject to certain terms and conditions

31.     On April 26, 2022, 37 Baking Holdings, LLC (the "<u>Prepetition Secured Party</u>") acquired all the rights of the Initial Lenders and the Agent under the First Lien Credit Documents pursuant to that certain Loan and Collateral Purchase Agreement among the Agent, Initial Lenders and Prepetition Secured Party dated as of April 26, 2022.

32.     As of the Petition Date, the Debtors are unconditionally jointly and severally indebted to the Prepetition Secured Party pursuant to the First Lien Credit Documents, in the aggregate outstanding principal amount of approximately $88 million *plus* accrued and unpaid interest with respect thereto of, and any additional fees, costs, expenses (including any attorneys', financial advisors', and other professionals' fees and expenses), and all other obligations owing under or in connection with the First Lien Credit Documents (collectively, the "<u>First Lien Obligations</u>").

**B.      The Second Lien Term Loan.**

33.     Holdings is borrower, with GSB and GS Real Estate as guarantors, under that certain second lien credit agreement, dated as of September 25, 2019 (as amended, restated, amended and restated, supplemented, or otherwise modified, the "<u>Second Lien Credit Agreement</u>"), among the Debtors and Parallel49 Equity (Fund V), Limited Partnership as

administrative agent (the "Second Lien Agent") and the lenders party thereto (the "Second Lien Lenders" and together with the Initial Lenders, the "Lenders"). The Second Lien Credit Agreement provides for a $10,025,000 term loan with a maturity date of January 23, 2023 (the "Second Lien Term Loan"). The Second Lien Term Loan is secured by a second priority lien on substantially all of the Debtors' assets as more particularly described in the Second Lien Credit Agreement and the related loan documents (together, the "Second Lien Documents"). Interest is payable under the Second Lien Term Loan semi-annually in arrears, on June 30 and December 31, with such interest payable-in-kind and added to the principal amount of the Second Lien Term Loan.

34.    On September 25, 2019, the Second Lien Parties entered into that certain Intercreditor Agreement, pursuant to which, among other things, the Second Lien Parties: (a) agreed to subordinate their liens to those of the Prepetition Secured Party; (b) agreed to not take any payment or enforce any remedies on account of the rights or obligations arising under the Second Lien Documents until the discharge of the First Lien Obligations; (d) agreed to not contest any cash collateral order or debtor-in-possession financing order; and (c) gave the Prepetition Secured Party a power of attorney, all as set forth in the Intercreditor Agreement.

### C.    The Senior Subordinated Notes.

35.    GSB is issuer, with Holdings and Real Estate as guarantors, under that certain note purchase agreement, dated as of April 24, 2015 (as amended, restated, amended and restated, supplemented, or otherwise modified, the "Note Purchase Agreement"), by and among the Debtors and the noteholders party thereto. The Note Purchase Agreement provides for $27,700,000 in senior subordinated unsecured notes due April 24, 2022 (the "Senior Subordinated Notes"). Interest is payable under the Notes Purchase Agreement semi-annually in arrears, on June 30 and

December 31, with such interest payable-in-kind and added to the principal amount of the Senior Subordinated Notes.

36.    Also on April 24, 2015, the holders of the Senior Subordinated Notes (the "Subordinated Noteholders") entered into a Subordination Agreement pursuant to which, among other things, the Subordinated Noteholders subordinated their right to any and all payment on account of the Senior Subordinated Notes to the payment in full of the First Lien Obligations.

### D.    The Equity Ownership.

37.    GSB's Equity is indirectly and privately held by certain institutional and individual investors, across one class of Common Equity Units and five classes of Preferred Equity Units. In total, non-Debtor Gold Standard Investment, LP ("GS Investment, LP") has issued 953,842 Common Equity Units and 116,397 Preferred Equity Units, equaling an overall indirect investment of $116,424,481 across the Debtors' investor group.[5]

### EVENTS LEADING TO THESE CHAPTER 11 CASES

38.    As discussed herein, a number of factors contributed to the Debtors' decision to commence these chapter 11 proceedings to implement a sale of substantially all of its assets (the "Sale"). Most notably, the disruption to the Debtors' workforce and its impact on liquidity, consistent maintenance and repair issues, increasing labor and material costs, and constraints on liquidity have considerably strained the Debtors' operations and business growth.

39.    Beginning in 2015, the Company began to see EBITDA margin declines that were partially driven by a product mix shift with a top customer that led to increased sales but decreased margins. Exacerbating already declining margins, in 2017 and 2018, the Company began to

---

[5]    As detailed on the Organizational Structure attached hereto as **Exhibit A**, GS Investment, LP holds 100% of Holdings' equity, and Holdings is the direct owner of 100% of GSB's equity.

10045972.v4

experience significant employee turnover as the result of an employee documentation issue. Historically, the Company entrusted staffing agencies to complete employment due diligence on new temporary employees as part of a "temp-to-perm" program whereby temporary employees could ultimately become permanent staff.  In early 2017, the Company received a "no match" letter from the Internal Revenue Service highlighting issues with approximately 230 employee social security numbers. As a result, these employees, many of whom had years of experience and were highly skilled, had to be transitioned from the business.

40.     The loss of its skilled workforce affected all aspects of the Company's business. The Company experienced significant disruption to its production capacity and had to rely heavily on temporary workers. The turnover and shift to temporary labor materially impacted the efficiency of operations and quality control, leading to detrimental financial results. The Chicago Facility's production rate decreased from an average of 15,500 pounds of goods produced per hour in 2017 to 7,700 pounds per hour in 2018. Relatedly, the Company experienced increases in the amount of wasted goods and the number of customer complaints. Between 2017 and 2020, the Company lost nearly $15 million of topline revenue in addition to several historic customers as a direct result of the workforce losses.

41.     The Company hired a new management team in 2018, which implemented new strategies to address the Company's workforce issues. Notably, the Company implemented a new temporary to permanent employee system to replace the lost workers. As the new workforce matured, the Company reduced headcount and need for temporary workers, as well as strengthened its relationship with the Union. The Company also reviewed its hiring policies and implemented its own documentation screening procedures. As a result, the Company began to see improvements in production and reductions in product waste with a stabilized full-time workforce.

14

42.    In particular, the Company's new management team addressed the stresses on profit margins by successfully passing price increases on to customers to cover rising material and labor costs and free up liquidity. The Company first implemented its price increases in 2019 and continued to engage in regular discussions with customers regarding pricing on a go-forward basis. The Company also received added liquidity in 2019 via P49, which entered into the Second Lien Credit Agreement with the Company, providing access to an additional approximately $10 million in new liquidity to put towards new capital investments.

43.    While the Company continued to address these ongoing challenges, the impact on liquidity and operations remained significant. Also, during this time period, the COVID-19 pandemic halted much of the Company's progress in addressing its labor and operational issues. The Company faced significant challenges during 2020 and 2021 due to labor shortages and restrictions. In 2021, to address the labor shortages in general, company introduced premium pay for hourly employees that further stabilized the workforce. These issues, along with continued rising repair and maintenance obligations due to aging equipment and mounting raw material costs, placed new stresses on the Company's growth. Accordingly, the Debtors engaged with their advisors to explore strategic out-of-court initiatives and market their assets. As discussed further herein, these efforts resulted in the successful consummation of the Wisconsin Sale. Nevertheless, an over-leveraged capital structure made chapter 11 the most viable option for the Debtors to preserve and maximize their remaining value by pursuing the Sale of their assets as a going concern, as the best path forward for all stakeholders.

## PREPETITION RESTRUCTURING EFFORTS AND CONTEMPLATED SALE

### E.    Advisor Retention.

44.    Beginning in early 2020, the Debtors, recognizing the need to reevaluate the business, hired a number of turnaround advisors to consider strategic alternatives, including

Houlihan Lokey Capital, Inc. ("Houlihan") as financial advisor and investment banker, and Riveron (formerly Conway Mackenzie, Inc.) as restructuring advisor. The Debtors worked with these advisors to consider their strategic options, including a potential sale of all or certain of the Debtors' business operations.  Notably, the Debtors received inbound interest in mid-2020 and engaged in a process with a select group of financial investors and buyers starting in June 2020 that was the basis for the subsequent July 2021 process discussed below.

### F.      Governance Initiatives.

45.      Once it became clear that the evaluation of a near-term restructuring transaction would be necessary, the Debtors proactively evaluated their corporate governance structure and decided to add Lisa Gavales to GSB's board of directors as a disinterested director in July 2019, and Patrick Bartels to GSB's board of directors as a disinterested director in June 2021 (together, the "Disinterested Directors"). Each of the Disinterested Directors was delegated the authority to review and act upon any matters pertaining to a potential restructuring or refinancing transaction in which a conflict may exist between the Debtors and their equity holders, affiliates, or their managers, directors, or officers.

### G.      Lender Engagement and Sale Evaluation.

46.      As noted herein, the Debtors began working in earnest with their lenders throughout 2020 to discuss the Debtors' liquidity outlook and request forbearances under the First Lien Credit Agreement and the Second Lien Credit Agreement, and a standstill agreement with holders of the Senior Subordinated Notes. Throughout the course of this process, the Debtors and their advisors evaluated various sale transactions, and discussed potential transactions with their lenders in conjunction with requests for forbearance. In conjunction, these two parallel processes were

designed to provide the Debtors with additional time to evaluate and execute a value-maximizing restructuring transaction.

### 1.     First Forbearance Agreements.

47.     As part of these initial discussions, the Debtors and Initial Lenders executed that certain Ninth Amendment to Credit Agreement and First Forbearance Agreement, dated April 20, 2021 (the "First 1L Forbearance Agreement"), pursuant to which, among other things, the Initial Lenders agreed to forbear from exercising their rights and remedies against the Debtors with respect to certain defaults, including failure to make principal and interest payments and comply with minimum liquidity and consolidated EBITDA requirements.  In addition, the Debtors and the Second Lien Lenders executed a Third Amendment to Second Lien Credit Agreement and First Forbearance Agreement, dated April 20, 2021 (the "First 2L Forbearance Agreement" and together with the First 1L Forbearance Agreement, the "First Forbearance Agreements"), pursuant to which, among other things, the Second Lien Lenders agreed to forbear from exercising their rights and remedies against the Debtors with respect to similar defaults under the Second Lien Credit Agreement.  The First Forbearance Agreements provided the Debtors with breathing room in the spring and early summer of 2021 to consider strategic alternatives and continue constructive engagement with the Lenders and other stakeholders regarding the terms of a value-maximizing sale process. In particular, the First Forbearance Agreements required the Debtors to deliver an updated confidential information memorandum ("CIM") and sale teaser materials to the Lenders by May 15, 2021.

### 2.     Standstill Agreement.

48.     In addition to negotiating with the Initial Lenders and Second Lien Lenders regarding forbearances, the Debtors also engaged with holders of the Senior Subordinated Notes with respect to a standstill on any rights held by such holders pursuant to the Note Purchase

17

Agreement. On April 20, 2021, the Debtors and the holders of the Senior Subordinated Notes executed that certain Eighth Amendment to Note Purchase Agreement and First Forbearance Agreement (the "Standstill Agreement"), pursuant to which, among other things, the holders of Senior Subordinated Notes agreed to forbear from exercising their rights and remedies against the Debtors with respect to certain defaults, including failure to comply with minimum liquidity and consolidated EBITDA requirements and existence of defaults under the First Lien Credit Agreement and Second Lien Credit Agreement for 150 days, through September 17, 2021.

### 3. Second Forbearance Agreements.

49. After several months of discussions between the Debtors and the Initial Lenders, and with a clearer view of a potential sale process, the Debtors and the Initial Lenders executed that certain Tenth Amendment to Credit Agreement and Second Forbearance Agreement, dated July 2, 2021 (the "Second 1L Forbearance Agreement"), pursuant to which, among other things, the Initial Lenders agreed to forbear from exercising their rights and remedies against the Debtors with respect to certain defaults, including failure to make principal and interest payments and comply with minimum liquidity, consolidated EBITDA, and consolidated EBITDAR requirements. Similarly, the Debtors and the Second Lien Lenders executed that Fourth Amendment to Second Lien Credit Agreement and Second Forbearance Agreement, dated July 2, 2021 (the "Second 2L Forbearance Agreement" and together with the Second 1L Forbearance Agreement, the "Second Forbearance Agreements"), pursuant to which, among other things, the Second Lien Lenders agreed to forbear from exercising their rights and remedies against the Debtors with respect to similar defaults under the Second Lien Credit Agreement.

50. Notably, the Second Forbearance Agreements required the Debtors to either consummate an out-of-court sale or in-court sale and provided the Debtors additional time to conduct a marketing process and otherwise evaluate potential restructuring transactions.

Moreover, the Second Forbearance Agreements contemplated consummation of any in-court sale transaction by January 12, 2022.

### 4.    The Wisconsin Sale.

51.    In the course of considering their strategic alternatives, including inbound interest and discussions with third parties during 2020 and engaging with the Lenders during the summer of 2021, it became clear to the Debtors and their advisors that a sale of the Debtors' equity interests or all or certain of their assets would likely result in the maximization of distributable value for the Debtors' stakeholders.  As such, and consistent with the Second Forbearance Agreements, the Debtors and their advisors initiated a comprehensive prepetition marketing process for the sale of the Debtors' business.

52.    In compliance with the milestones set forth in the Second Forbearance Agreements, on July 6, 2021, Houlihan spearheaded outreach to a broad universe of relevant strategic and financial parties to assess interest in an acquisition of the Company. Specifically, on July 6, 2021, Houlihan spearheaded outreach to a broad universe of relevant strategic and financial parties to assess interest in an acquisition of the Company. Houlihan contacted approximately 102 parties, 71 of which negotiated and executed confidentiality agreements and, starting July 13, 2021, were provided with a CIM and access to a virtual data room containing detailed information about the Debtors' business.  Houlihan then held numerous calls with interested parties to respond to diligence and discuss the current situation and process.

53.    The Debtors received six written indications of interest by the July 29, 2021 deadline, with three additional parties submitting a written indication of interest by August 6, 2021. Of these nine parties, four were strategic companies and five were financial investors. After reviewing all nine formal indications of interest and in consultation with their advisors, the Debtors' management team invited six of the parties to further discuss the

19

possibility of a potential transaction in advance of the deadline to submit a final bid on September 9, 2021. Subsequently, two of those parties submitted a formal letter of intent to purchase substantially all of the Debtors' assets, one on September 9, 2021 and the other on September 15, 2021. Multiple additional parties indicated a potential interest in a sale transaction but did not submit a formal letter of intent.

54.     As part of evaluating the received letters of intent as well as the formal and informal discussions with potential purchasers, it was apparent to the Debtors that certain potential purchasers were interested in purchasing only a portion of the Debtors' business. As a result, the Debtors and their advisors determined that a sale of portions of the Debtors' business to multiple purchasers could potentially maximize value as compared to the distributable value that would inure to the estates from any one purchaser of the Debtors' full business operations. The Debtors' advisors consulted with advisors to the Lenders and the holders of the Senior Subordinated Notes and determined to re-contact parties that had previously expressed informal and/or initial indications of interest to gauge interest in a potential purchase of some, but not all, of the Debtors' business. The Debtors also re-engaged additional parties to further survey potential interest in a sale of all of the Debtors' business.

55.     On October 4, 2021, Arbor Investments Management, LLC and Crown Bakeries, LLC (collectively, "Arbor") submitted a formal letter of intent for the purchase of the Wisconsin Facility with a contemplated closing of November 1, 2021. The Debtors and their advisors subsequently engaged in further discussions with Arbor regarding the terms of the proposed sale. Following several weeks of negotiations, on December 10, 2021, the Debtors consummated the Wisconsin sale transaction with Arbor.

10045972.v4

**H.    Continued Exploration of Options for the Chicago Facility.**

56.    While discussions with Arbor remained ongoing, the Debtors and their advisors continued to evaluate value-maximizing paths forward for the Chicago Facility. Over the last twenty-four months, the Debtors engaged in continuous communication with their lenders, entered into several rounds of forbearance negotiations, and evaluated multiple possible sale transactions and other out-of-court deals, including the shutdown of the Chicago Facility and piecemeal liquidation of its assets.

57.    Through March and April of 2022, the Initial Lenders explored the potential for the sale of its First Lien Obligations and the assignment of the First Lien Documents. Ultimately, on April 26, 2022, 37 Baking Holdings, LLC acquired all the rights of the Initial Lenders and the Agent under the First Lien Credit Documents pursuant to that certain Loan and Collateral Purchase Agreement the Agent, Initial Lenders and 37 Baking Holdings, LLC dated as of April 26, 2022.

58.    37 Baking Holdings, LLC is an entity formed to acquire the First Lien Obligations and First Lien Documents and is owned by several investment funds and minority-owned by several current GSB employees.  Specifically, a minority member (who is also a member of the Board of Managers) of 37 Baking Holdings, LLC (the Stalking Horse Bidder) is the Chief Executive Officer of Gold Standard Baking, LLC and was, until June 13, 2022, a member of the board of managers of Debtor Gold Standard Baking, LLC.  Five other minority investors of 37 Baking Holdings, LLC hold management positions at Gold Standard Baking, LLC as of the Petition Date.  One additional minority investor of 37 Baking Holdings, LLC (who is also a member of the Board of Managers), is (i) a limited partner of Parallel49 Equity (Fund V), Limited Partnership, which is the largest second lienholder on all or substantially all of the Debtors' assets as of the Petition Date; (ii) a limited partner of Parallel49 Equity (Fund V), Limited Partnership, which is the largest equityholder Gold Standard Investment, LP; (iii) a limited partner of Parallel49

Equity GP (Fund V), Limited Partnership which is the general partner of Parallel49 Equity (Fund V), Limited Partnership; (iv) employed by Parallel49 Equity U.S. Management (Fund V), Inc., which is the management company of Parallel49 Equity (Fund V), Limited Partnership; and (v) a former director and/or officer of related Debtor entities, including Gold Standard GP, LLC; Gold Standard Investment, LP; Gold Standard Holdings, Inc.; Gold Standard Baking, LLC; and Gold Standard Real Estate, LLC.

59.     After the acquisition of the First Lien Obligations and First Lien Documents by 37 Baking Holdings, LLC, discussions with the Company continued with respect to viable options for the Chicago Facility.   In mid-May 2022, the Debtors retained Klehr Harrison Harvey Branzburg LLP as counsel, to join the restructuring team including Houlihan and Riveron.  After continued discussions, ultimately 37 Baking Holdings, LLC agreed to serve as the stalking horse bidder (the "Stalking Horse Bidder") pursuant to the terms of that certain asset purchase agreement, dated June 22, 2022 (the "Stalking Horse Agreement") to acquire the Debtors' remaining assets at the Chicago Facility as a going concern, to expose the stalking horse agreement to higher and better offers through a chapter 11 process, and to support the process by agreeing to the Debtors' use of cash collateral and providing needed debtor-in-possession financing.

60.     Under the terms of the Stalking Horse Agreement, the Stalking Horse Bidder will purchase the Assets for an aggregate purchase price consisting of: (i) a credit bid in the amount of a portion of the First Lien Obligations in the amount of $20 million; (ii) assumption of certain assumed liabilities as provided in the Stalking Horse Agreement (including the DIP Financing

22

Obligations); and (iii) the assumption and assignment of the Assumed Contracts to the Stalking

Horse Bidder (each term as defined in the Stalking Horse Agreement).

## I.      Goals of the Chapter 11 Cases.

61.     The Company commenced these chapter 11 cases to preserve value for its

stakeholders, including its employees and creditors. Additionally, the Debtors have negotiated a

debtor-in-possession financing facility that will allow the Debtors to continue to operate in the

normal course, pay landlords and vendors, and have sufficient liquidity to pay the administrative

costs, both operational and statutory, required in these chapter 11 cases.

62.     Contemporaneously with the filing of these chapter 11 cases, the Debtors filed their

bid procedures and sale motion with the Bankruptcy Court, which seeks approval to enter into the

Stalking Horse Agreement and establish a formal sale timeline, which will include an auction

process, with a goal of exposing the existing asset purchase agreement to higher and better offers.

63.     After the Petition Date, the Debtors and Houlihan will continue discussions with

interested parties and market the Debtors' assets with a goal of maximizing value for the Debtors'

estates.

64.     The Debtors believe that a marketing and sale process through these chapter 11

cases is in the best interests of the Company's creditors, vendors, customers , and employees and

will maximize the value of their estates.

## EVIDENTIARY SUPPORT FOR FIRST DAY MOTIONS

65.     Contemporaneously herewith, the Debtors have filed a number of first day

pleadings seeking relief that it believes is necessary to enable the Company to efficiently

administer its estates with minimal disruption and loss of value during the pendency of these

chapter 11 cases. The Debtors request that the relief requested in each of the first day motions be

granted as critical elements in ensuring the maximization of value of the estates. I believe that the

10045972.v4

relief requested in the first day motions is necessary to allow the Company to operate with minimal disruption during the pendency of these chapter 11 cases.  I have reviewed each of the first day motions discussed below, and the facts set forth in each first day motion are true and correct to the best of my knowledge and belief, with appropriate reliance on corporate officers and advisors. A description of the relief requested in and the facts supporting each of the first day motions is set forth in **Exhibit B** attached hereto and incorporated herein by reference.

*[Remainder of page intentionally left blank.]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated:  June 22, 2022                              */s/ John T. Young, Jr.*
                                                    John T. Young, Jr.
                                                    Chief Restructuring Officer
                                                    Gold Standard Baking, LLC

**Exhibit A**

**Corporate Organizational Structure**



## Exhibit B

**Evidentiary Support for First Day Motions**

<u>**Evidentiary Support for First Day Motions**</u>[1]

I.  **Debtors' Motion Seeking Entry of an Order (I) Directing Joint Administration of Their Related Chapter 11 Cases and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>").**

1.  Pursuant to the Joint Administration Motion, the Debtors request entry of an order (a) directing procedural consolidation and joint administration of their related chapter 11 cases and (b) granting related relief.  Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience and cost savings to the Debtors without harming the substantive rights of any party in interest.

2.  Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity.  For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors.  The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.  Joint administration of these chapter 11 cases, for procedural purposes only, under a single docket, will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding, instead of multiple independent chapter 11 cases.  Finally, joint administration will allow the U.S. Trustee and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.  Accordingly, I respectfully submit that the Joint Administration Motion should be approved.

II.  **Motion of the Debtors for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364 and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to § 364 of the Bankruptcy Code; (II) Authorizing Use of Cash Collateral Pursuant to § 363 of the Bankruptcy Code; (III) Granting Liens and Super-Priority Claims; (IV) Granting Adequate Protection to the Prepetition Secured Party and DIP Facility Lender; and**

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the applicable first day motion.

**(V) Scheduling a Final Hearing  Pursuant to Fed. R. Bankr. P. 4001(b) and (c) (the "<u>Cash Collateral and DIP Motion</u>").**

3.      The Debtors have an immediate need for access to incremental liquidity in the form of postpetition financing as well as access to Cash Collateral.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to cash.  The Debtors will use cash to, among other things, continue operating their businesses and satisfy other working capital needs during these chapter 11 cases.  The Debtors believe that all or substantially all of their available cash constitutes the cash collateral, as that term is used by section 363(c) of the Bankruptcy Code, of the Prepetition Secured Party.  The Debtors will therefore be unable to proceed with operating their businesses without the ability to use Cash Collateral and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  In short, the Debtors' ability to finance their business operations, and the availability of sufficient working capital and liquidity to the Debtors through the use of Cash Collateral, is vital to the preservation and maintenance of the value of the Debtors' estates and the successful prosecution of these chapter 11 cases.

4.      Further support for the DIP Motion can be found in the First Day Declaration and the *Declaration of Ryan Sandahl in Support of the Cash Collateral and DIP Financing Motion* (the "<u>DIP Declaration</u>") filed contemporaneously herewith.  The Cash Collateral and DIP Motion seeks authority for the Debtors to obtain a DIP Facility with up to $1,500,000 in new money, including $500,000 during the interim period and an additional $1,000,000 upon entry of the Final Order (the "<u>DIP Facility</u>" and the loans made thereunder, the "<u>DIP Loans</u>") on the terms and conditions set forth in the DIP Orders and the DIP Term Sheet to be executed among each of the Debtors as borrowers and 37 Baking Holdings, LLC as lender (the "<u>DIP Facility Lender</u>").  Without access to postpetition financing, I believe the Debtors would lack sufficient funds to meet

2

their working capital needs and operate their business during these chapter 11 cases, including payment of employees and vendors, resulting in significant impairment of the value of the Debtors' estates to the detriment of all stakeholders.

5.      In light of the Debtors' liquidity position, I have assisted the Debtors in an evaluation of the Debtors' financing needs and funding alternatives and have worked closely with the Debtors, their management team, and their advisors to evaluate the Debtors' cash requirements for their businesses.  As part of their evaluation of the Debtors' financing needs, I worked with the Debtors in developing a cash flow forecast, which took into account anticipated cash receipts and disbursements during the projected period and considered a number of factors, including the effect of the chapter 11 filing on the operations of the business, likely fees and interest expenses associated with any debtor-in-possession financing facility, professional fees, and required operational payments.  Given the Debtors' circumstances and for the reasons set forth below, I believe that the terms of the DIP Facility, as set forth in the DIP Term Sheet, are fair, reasonable, and adequate.

6.      Based on the foregoing, it is my belief that the DIP Facility and consensual use of Cash Collateral represents the best option available to address the Debtors' immediate liquidity needs and is a critical component of the Debtors' chapter 11 strategy.  It is also my belief that the terms and conditions of the DIP Facility are reasonable and appropriate under the circumstances and were the product of extensive good-faith, arm's-length negotiations with the DIP Facility Lender.  Specifically, the Debtors determined that the milestones and covenants contained in the DIP Term Sheet were negotiated and required by the DIP Facility Lender as a condition to the DIP Facility.  Under the circumstances of these chapter 11 cases, these provisions are reasonable and appropriate.

7.    Finally, the Debtors' businesses are cash intensive, with significant recurring costs required to satisfy obligations to vendors and employees.  As such, and due to their current limited liquidity, the Debtors require immediate access to the DIP Facility and the use of Cash Collateral to operate their businesses, preserve value, and to avoid irreparable harm pending the Final Hearing.  Absent funds available from the DIP Facility and access to Cash Collateral at this critical early stage, the Debtors could face a value-destructive interruption to their businesses—which, in turn, would hinder the Debtors' ability to maximize the value of their estates—and be forced to curtail their operations significantly and to the detriment of the Debtors, their estates, and their creditors.

8.    The Debtors seek further authorization to use the proceeds of the DIP Facility as expressly provided in the DIP Term Sheet and DIP Orders and consistent with the Budget to pay operational, employee, and other costs of the Debtors, and payments related to the working capital and other general corporate purposes of the Debtors, including the payment of professional fees and expenses, and other administrative costs of these Chappter 11 Cases.  As set forth in the Cash Collateral and DIP Motion, the Debtors also seek authorization to execute and deliver the DIP Term Sheet and related documents and to perform such other and further acts as may be necessary or appropriate in connection therewith.

9.    In exchange for the DIP Loans, the DIP Facility Lender will receive a superpriority allowed administrative expense claim status in the chapter 11 cases and a postpetition  security interests in and liens on all property and assets of the Debtors, of every kind or type whatsoever, tangible, intangible, real, personal or mixed, whether now owned or hereafter acquired or arising, wherever located; all property of the estate of the Debtors within the meaning of section 541 of the Bankruptcy Code (including avoidance actions arising under chapter 5 of the Bankruptcy Code

4

and applicable state law, subject to entry of the Final Order); and all proceeds, rents and products of the foregoing, with the exception of certain assets as expressly provided in the DIP Term Sheet, subject to certain excluded assets and carve outs.

10.     The Cash Collateral and DIP Motion, if granted, provides authority for the Debtors to use, among other things, in accordance with the Budget, any cash collateral in which the Prepetition Secured Party may have an interest and the granting of adequate protection to the Prepetition Secured Party with respect to any diminution in value of their interests in the Prepetition Collateral arising from, inter alia, the Debtors' use of the Prepetition Collateral (including Cash Collateral), or the imposition of the automatic stay under section 362 of the Bankruptcy Code.

11.     The Debtors, therefore, request immediate authority to obtain postpetition financing in the form of the DIP Loans and use Cash Collateral on an interim basis, as set forth in the Cash Collateral and DIP Motion and in the Interim Order, to prevent immediate and irreparable harm to their estates pending the Final Hearing.

**III.     Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions and (II) Granting Related Relief (the "<u>Cash Management Motion</u>").**

12.     Pursuant to the Cash Management Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to (i) continue to operate their Cash Management System and maintain their existing Bank Accounts, (ii) pay any prepetition or postpetition amounts outstanding on account of the Bank Fees, (iii) maintain existing Business Forms in the ordinary course of business, and (iv) perform any necessary Intercompany Transactions on an as-needed basis, and (b) granting related relief.

13.     The Debtors' Cash Management System is similar to the centralized cash management systems used by similarly situated companies to manage the cash of operating units in a cost-effective and efficient manner.  The Debtors use the Cash Management System to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' treasury department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, receiving, and releasing funds, including in connection with any Intercompany Transactions.  The Debtors' accounting department reconciles the Debtors' books and records on a daily basis to ensure that all transfers are accounted for properly.

14.     I believe that the Bank Accounts generally comply with section 345 of the Bankruptcy Code.  Although Northbrook is not an authorized depository, I believe it is a trustworthy, well-capitalized, and financially stable institution with a strong reputation, and is well positioned to continue to perform depository and cash management functions during these chapter 11 cases.  The Bank Accounts are insured by the FDIC up to the applicable insured limits. Additionally, the Debtors' customers, suppliers, and vendors rely on the Bank Accounts, in particular the Operating Account, and it is therefore not feasible to consolidate all cash activities into the narrow group of financial institutions approved in the U.S. Trustee Guidelines.

15.     The Debtors have not historically engaged in Intercompany Transactions, but may need to do so during these chapter 11 cases.  For example, one Debtor entity may pay accounts payable owed by another Debtor or one Debtor entity may receive accounts receivable payments due to another Debtor.  Indeed, comparable transactions regularly occur at businesses of similar size and complexity as the Debtors.  Any such Intercompany Transactions would be settled in cash or reflected as journal entry receivables and payables, as applicable, in the respective Debtors'

6

accounting systems.  The Debtors track all fund transfers through their accounting system and would be able to ascertain, trace, and account for all postpetition Intercompany Transactions, should they occur.  I believe that the inability to engage in Intercompany Transactions on an-as needed basis could disrupt the Debtors' operations to the detriment of the Debtors, their creditors, and other stakeholders.

16.     Because of the nature of the Debtors' business and the disruption thereto that would result if the Debtors were forced to close their existing Bank Accounts, I believe it is critical that the Cash Management System remain in place.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

**IV.     Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, Reimbursable Employee Expenses, and Non-Insider Severance and (B) Continue Employee Benefits Programs and (II) Granting Related Relief (the "Wages Motion").**

17.     As of the Petition Date, the Debtors employ approximately 333 employees (collectively, the "Employees"), all of which are full-time Employees and based in the United States.[2]  In addition to the Employees, the Debtors also periodically retain temporary workers (collectively, the "Temporary Staff") sourced regularly from certain staffing agencies (collectively, the "Staffing Agencies")[3] to fulfill certain duties on a short- and long-term basis. The amount of Temporary Staff varies, but the Debtors were utilizing approximately 48

---

[2]     Full-time Employees are Employees who are regularly scheduled to work at least 30 hours or more per week.

[3]     Currently, all of the Temporary Staff in the Debtors' Chicago facility are sourced by Elite Staffing, Inc.  For the avoidance of doubt, the Debtors request relief with respect to any staffing agency, regardless of whether such agency is specifically listed herein.

7

Temporary Staff as of the Petition Date.  Temporary Staff are ineligible for benefits.  The aggregate number of Employees and Temporary Staff fluctuates on a week-to-week basis depending on the Debtors' production needs at such time.

18.     The Employees and Temporary Staff perform a wide variety of functions that are critical to the preservation of value and the administration of the Debtors' estates.  In many instances, the Employees and Temporary Staff include personnel who are intimately familiar with the Debtors' business, processes, and systems, and who cannot be easily replaced.  Without the continued, uninterrupted services of the Employees and Temporary Staff, the Debtors' business operations will be halted immediately and the administration of their estates materially impaired.

19.     Approximately 12% of the Employees are compensated on a salary basis and the remaining Employees and all of the Temporary Staff are compensated on an hourly basis.  As of the Petition Date, approximately 262 Employees (the "Represented Employees" and, conversely, the "Non-Represented Employees") are represented by the Chicago and Midwest Regional Joint Board Affiliated with Workers United/SEIU (the "Union").[4]  The Represented Employees are comprised of full- and part-time production, sanitation, maintenance, and dock workers.

20.     The vast majority of the Employees and Temporary Staff rely on their compensation and benefits to pay their daily living expenses.  These workers will be unfairly harmed if the Debtors are not permitted to continue paying compensation and providing health and other benefits during these chapter 11 cases, and the Debtors' ability to retain such individuals and/or hire additional workers would be imperiled.  Consequently, I believe the relief requested is necessary and appropriate.

---

[4]     Gold Standard Baking, LLC. ("OpCo") is party to a collective bargaining agreement with the Union effective as of April 1, 2021 (the "CBA").

8

21.     The Debtors' estimates of the aggregate prepetition amounts owed on account of each Employee Compensation and Benefits program are set forth in the table below:

| Employee Obligation | Interim Amount | Final Amount |
|---|---|---|
| **Employee Compensation** | **$1,257,000** | **$1,257,000** |
| Employee Compensation | $525,000 | $525,000 |
| Temporary Staff Compensation | $450,000 | $450,000 |
| Brokers' Commissions | $200,000 | $200,000 |
| Withholding Obligations | $50,000 | $50,000 |
| ADP Fees | $17,000 | $17,000 |
| Expense Obligations | $15,000 | $15,000 |
| **Employee Benefits Programs** | **$112,000** | **$112,000** |
| Health Benefit Plan Amounts | $23,000 | $23,000 |
| Standard Payments | $1,000 | $1,000 |
| Unremitted Supplemental Benefit Deductions | $30,000 | $30,000 |
| Fund Office Fees | $6,000 | $6,000 |
| 401(k) Employer Contributions | $12,000 | $12,000 |
| Unremitted 401(k) Deductions | $40,000 | $40,000 |
| **Total** | **$1,369,000** | **$1,369,000** |

22.     As further described in the Wages Motion, the Debtors are seeking authority to (a) pay and honor prepetition claims relating to the Employee Compensation and Benefits; and (b) pay all costs incident to the Employee Compensation and Benefits.  I believe that failure to pay the prepetition Employee and Temporary Staff-related obligations during the administration of these chapter 11 cases would jeopardize the Debtors' ability to retain Employees and Temporary Staff and thereby impair the Debtors' reorganization efforts.

23.     As more fully set forth in the Wages Motion, out of an abundance of caution, the Debtors seek authority to continue to pay any unpaid amounts due with respect to Director Compensation in the ordinary course and consistent with past practice and to continue paying Director Compensation in the ordinary course postpetition.  Each Debtor maintains a board of directors that includes certain Independent Directors.  The board of directors of Gold Standard Baking, LLC is comprised of seven directors, two of which are Disinterested Directors.  The board of directors of Gold Standard Holdings, Inc. and the board of managers of Gold Standard Real

9

Estate, LLC are both comprised of four directors, two of which are Disinterested Directors.  The Disinterested Directors each receive monthly cash compensation of $25,000 (the "Disinterested Director Fees").  The Disinterested Directors are also entitled to expense reimbursement for reasonable out of pocket expenses incurred in connection with their service, and $5,000 for each day on which they devote at least four hours of time preparing for or participating in a deposition or court appearance on behalf of the Debtors (the "Disinterested Director Expenses").

24.     In addition to the Disinterested Directors, non-Employee directors John Machuzick and Frank Hopfinger are each entitled to cash compensation of $50,000 per year and expense reimbursement for reasonable out of pocket expenses incurred in connection with their service.  As of the Petition Date, the Debtors are current in relation to Director Compensation.  The other members of the boards of directors or managers of the Debtors are not entitled to any additional compensation for their role as a director or manager, as applicable.

25.     I believe the Employees provide the Debtors with services necessary to conduct the Debtors' business, and, absent the payment of the Employee Compensation and Benefits Programs owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time.  I believe that, without these payments, the Employees may elect to seek alternative employment opportunities, disrupting the Debtors' business operations.  I believe that the maximization of value of the Debtors' estates is inextricably tied to their workforce, which cannot be replaced without significant efforts—efforts that might not be successful and may be more expensive given the overhang of these chapter 11 cases.  I believe enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.  I, therefore, believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give

10

the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their business in these chapter 11 cases.

26.     Therefore, I believe that the relief requested in the Wages Motion inures to the benefit of all parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Wages Motion.

## V.     Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Lien Claimants and (II) Granting Related Relief (the "Lien Claimants Motion").

27.     Pursuant to the Lien Claimants Motion, the Debtors seek entry of interim and final orders (a) authorizing, but not directing, the Debtors to pay prepetition amounts in the ordinary course owing on account of certain Lien Claimants, in an aggregate interim amount not to exceed $1.6 million and in an aggregate final amount, inclusive of amounts paid pursuant to the Interim Order, not to exceed $1.3 million; (b) continuing to honor outstanding obligations to Lien Claimants on a postpetition basis in the ordinary course of business and consistent with historical practice; and (c) granting related relief.

28.     The uninterrupted delivery of goods is essential to maintaining the going concern value of the Debtors.  The Debtors' ability to generate sales is dependent on their ability to ensure that inventory is available for purchase and delivery to their customers.  Without the ability to deliver and distribute product, the Debtors' ability to generate revenue is impaired.

29.     The Debtors typically receive their material inputs at their leased manufacturing facility.  These inputs consist of both bulk and prepackaged ingredients as well as packaging materials.  The Debtors contract with third-party logistics providers, including but not limited to Metraco, to ship their finished goods to a cold storage warehouse.  The finished goods, with the exception of Sysco products, leave the warehouse via third-party logistics providers to customers. The Debtors utilize approximately 15-20 trucking carriers to ship products from the warehouse.

11

Additionally, certain customers contract with trucking carriers directly. The Sysco products are shipped to an intermediary warehouse before being shipped out by Sysco. These third-party carriers and warehouses are in current possession of the Debtors' property as of the Petition Date (collectively, and as discussed below, the "Possessory Lien Claimants"). Under the laws of most states, these warehousemen and carriers will, in certain circumstances, have a lien on the goods in their possession that secures the charges or expenses incurred in connection with the transportation or storage of the goods. If the Possessory Lien Claimants' claims are not satisfied, they may refuse to release the Debtors' property, thereby disrupting the Debtors' product flow and operations.

30.     The Debtors also rely on, and contract with, a number of third parties to obtain equipment used at their facilities and also have such equipment maintained and repaired. The Debtors may owe money to these third parties as a result of the goods and services they have provided. Under applicable state law, many of these parties have a right to assert and perfect statutory liens, which attach to the Debtors' real and personal property (collectively, the "Statutory Lien Claimants," and together with the Possessory Lien Claimants, the "Lien Claimants").

31.     The Debtors rely on timely and frequent delivery of critical inventory items, goods, and services and any interruption in this supply—however brief—would disrupt the Debtors' operations and could potentially cause irreparable harm to their businesses, goodwill, employees, customer base, and market share. Such harm would likely far outweigh the cost of payment of the Lien Charges. I believe that the relief requested in the Lien Claimants Motion will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise. I believe that the relief requested in the Lien Claimants Motion is in the best interests of the Debtors' estates, their creditors, and all other parties

in interest, and will enable the Debtors to continue to operate their business in chapter 11. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Lien Claimants Motion.

**VI.    Debtors' Motion Seeking Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, (IV) Authorizing Certain Fee Payments for Services Performed, (V) Requiring Utility Providers to Return Deposits for Utility Services No Longer in Use, and (VI) Granting Related Relief (the "<u>Utilities Motion</u>").**

32.    Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders: (a) determining adequate assurance of payment for future utility services; (b) prohibiting utility providers from altering, refusing, or discontinuing utility services; (c) establishing procedures for determining adequate assurance of payment; (d) requiring utility providers to return deposits for utility services no longer in use; and (e) granting related relief.

33.    In connection with the operation of their business and management of their properties, the Debtors historically obtain Utility Services from a number of Utility Providers.  The Debtors pay the Utility Providers directly for the Utility Services, including for Utility Services at the Debtors' manufacturing locations in Chicago, Illinois and Pleasant Prairie, Wisconsin.

34.    The Debtors propose depositing into a segregated account the Adequate Assurance Deposit of $58,292.21, which represents an amount equal to approximately one-half of the Debtors' average monthly cost of Utility Services, calculated based on the Debtors' average utility expenses over the 12-month period ending May 31, 2022, excluding deposits and letters of credit. The Adequate Assurance Deposit will be held in the Adequate Assurance Account at Northbrook Bank & Trust, N.A. for the benefit of the Utility Providers and for the duration of these chapter 11 cases and may be applied to any postpetition payment defaults owed to the Utility Providers by

13

the Debtors.  The Adequate Assurance Deposit will be held by the Debtors, and no liens will encumber the Adequate Assurance Deposit or the Adequate Assurance Account.

35.     Additionally, the Debtors seek approval of their proposed Adequate Assurance Procedures.  These procedures allow Utility Providers to request adequate assurance for unpaid Utility Services and additional adequate assurance when they believe the proposed amount is not sufficient.  This ensures that all key stakeholder groups obtain notice of such request before it is honored.

36.     Furthermore, the Debtors request that the Utility Providers, including subsequently added Utility Providers, absent compliance with the Adequate Assurance Procedures, be forbidden from altering, refusing, or discontinuing service or requiring additional assurance of payment other than the Proposed Adequate Assurance.  Utility Services should be preserved on an uninterrupted basis because it is essential to the Debtors' ongoing operations and a successful reorganization. Termination of any Utility Services could result in the Debtors' inability to operate their business to the detriment of all stakeholders.  Therefore, it is critical that Utility Services continue uninterrupted during these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

**VII.    Debtors' Application For Entry of an Order (I) Authorizing and Approving the Appointment of Omni Agent Solutions As Claims and Noticing Agent and (II) Granting Related Relief (the "<u>Omni 156(c) Retention Application</u>").**

37.     Pursuant to the Claims and Noticing Agent Application, the Debtors seek entry of an order (a) appointing Omni Agent Solutions ("<u>Omni</u>") as claims and noticing agent for the Debtors and their chapter 11 cases, effective *nunc pro tunc* to the Petition Date, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' chapter 11 cases, and (b) granting related relief.

14

38.     Based on my discussions with the Debtors' advisors, I believe that the Debtors' selection of Omni to act as the Claims and Noticing Agent is appropriate under the circumstances and in the best interest of the estates.   Moreover, it is my understanding that based on all engagement proposals obtained and reviewed that Omni's rates are competitive and comparable to the rates charged by their competitors for similar services.

39.     The Debtors anticipate that there will be thousands of persons and entities to be noticed in these chapter 11 cases.  In light of the number of parties in interest and the complexity of the Debtors' business, the Debtors submit that the appointment of a claims and noticing agent will provide the most effective and efficient means of, and relieve the Debtors and/or the Clerk's office of the administrative burden of, noticing and processing proofs of claim and is in the best interests of both the Debtors' estates and their creditors.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Omni 156(c) Retention Application.

## VIII.     Debtors' Motion Seeking Entry of Interim and Final Orders Authorizing the Debtors to Pay Prepetition Claims of 503(B)(9) Claimants and Critical Vendors and Granting Related Relief (the "Vendor Motion").

40.     Pursuant to the Vendor Motion, The Debtors seek entry of interim and final orders (a) authorizing the Debtors to pay certain prepetition amounts owing on account of certain 503(b)(9) Claimants and Critical Vendors, in an aggregate interim amount not to exceed $1.3 million and in an aggregate final amount not to exceed, inclusive of amounts paid pursuant to the Interim Order, $2.0 million and (b) granting related relief.

41.     *503(b)(9) Claimants*.  The Debtors require a substantial amount of raw materials and packaging to manufacture their products.  The Debtors receive such goods and materials from various vendors (collectively, the "503(b)(9) Claimants") daily and thus have received substantial goods within the 20-day period immediately preceding the Petition Date.  Certain of the 503(b)(9) Claimants do not have long-term contracts with the Debtors.  Rather, the Debtors obtain inventory,

15

goods, or other materials from the 503(b)(9) Claimants on an order-by-order basis.  As a result, the 503(b)(9) Claimants may refuse to supply new orders without payment of their prepetition claims.  The Debtors also believe certain 503(b)(9) Claimants could reduce the Debtors' existing trade credit—or demand payment in cash on delivery—further exacerbating the Debtors' limited liquidity.

42.     As of the Petition Date, the Debtors believe they owe approximately $1.8 million on account of goods delivered within the 20 days immediately preceding the Petition Date, approximately $1.2 million of which may come due in the first 25 days after the Petition Date and the value of which may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code.

43.     The Debtors do not seek to accelerate or modify existing payment terms with respect to the 503(b)(9) Claims.  Rather, the Debtors will pay the 503(b)(9) Claims so that the vendors receive payments on approximately the same schedules as if these chapter 11 cases had not been commenced.  Further, as with the Critical Vendor Claims, the Debtors seek authority to pay only those amounts that they determine are necessary or appropriate to (a) obtain critical or valuable goods, (b) maintain a reliable, efficient, and smooth distribution system, and (c) induce the 503(b)(9) Claimants to continue to provide goods.  The Debtors intend to pay prepetition 503(b)(9) Claims only where they believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs to their estates.

44.     ***Critical Vendors.***  Pursuant to the Critical Vendors Motion, the Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to pay the Critical Vendors Claims in an amount not to exceed $0.1 million pursuant to the Interim Order and, in the aggregate, inclusive

of amounts paid pursuant to the Interim Order, an amount not to exceed $0.2 million pursuant to the Final Order, in each case absent further order of the Court; and (b) granting related relief.

45. The Debtors have entered into the Stalking Horse Agreement that generally provides for the assumption of the Debtors' trade debt. Accordingly, the Debtors expect that the claims held by their Critical Vendors will be fully satisfied and the Vendor Motion will merely impact the timing of that satisfaction. However, the Critical Vendors are so essential to the Debtors' business that the lack of any of their particular goods or services, even for a short duration, could significantly disrupt the Debtors' operations and cause irreparable harm to the Debtors' business, goodwill, and market share.

46. There is a significant overlap between the Supply Vendors and 503(b)(9) Claimants. Therefore, many of the vendors possess claims that could be considered both a 503(b)(9) Claim and a Critical Vendor Claim. Since the 503(b)(9) Claims are entitled to administrative priority, to the extent practicable, the Debtors will attempt to treat such claims that overlap both categories as 503(b)(9) Claims. The Debtors expect that the payment of 503(b)(9) Claims as requested by the Vendor Motion will be sufficient to smooth the receipt of payments by such vendors and expect to make payments to these overlap claimants only in rare instances where absolutely necessary.

47. The Debtors have identified the Critical Vendors as vital to the Debtors' go-forward operations. In many cases, the Critical Vendors provide products and services that are only available from a limited number of vendors, and in some cases, only one vendor. Even where alternative vendors exist, the costs and business disruptions associated with switching from one vendor to another are often significant and would be detrimental to the Debtors' estates.

17

Additionally, some smaller vendors would not otherwise be able to continue supplying the Debtors if some, or all, of their Critical Vendor Claims are satisfied.

48.    In return for paying the Critical Vendors, either in full or in part, the Debtors will make commercially reasonable efforts to ensure that the Critical Vendors provide customary or favorable trade terms for the postpetition procurement of goods and services.  Specifically, the Debtors seek authorization to condition payment of the Critical Vendor Claims upon such claimant's agreement to continue—or recommencement of—supplying such products and services to the Debtors in accordance with trade terms (including credit limits, discounts, pricing, timing of payments, availability, and other terms) consistent with the parties' ordinary course practice or as otherwise agreed by the Debtors in their reasonable business judgment.

49.    In addition, the Debtors request that if any party accepts payment pursuant to the relief requested by the Vendor Motion and thereafter does not continue to provide goods or services on Customary Trade Terms:  (a) the Debtors may take any and all appropriate steps to cause such Critical Vendor to repay payments made to it on account of its prepetition claim to the extent that such payments exceed the postpetition amounts then owing to such Critical Vendor; (b) upon recovery by the Debtors, any prepetition claim of such party shall be reinstated as if the payment had not been made; and (c) if there exists an outstanding postpetition balance due from the Debtors to such party, the Debtors may elect to recharacterize and apply any payment made pursuant to the relief requested by the Motion to such outstanding postpetition balance and such supplier or vendor will be required to repay to the Debtors such amounts that exceed the postpetition obligations then outstanding without the right of any setoffs, claims, provisions for payment of any claims, or otherwise.

10014668.v4

50.     Accordingly, in light of the potential for immediate, irreparable consequences if the Critical Vendors fail to continue to provide uninterrupted and timely deliveries of goods and services, the Debtors have determined, in the exercise of their business judgment, that payment of the Critical Vendor Claims is essential to preserve the go-forward business and to avoid costly disruptions in the Debtors' operations.

51.     Recognizing that payment of all prepetition claims of these third-party vendors outside of a plan of reorganization would be extraordinary relief, the Debtors, with the assistance of their advisors, reviewed their books and records, consulted with operations management and purchasing personnel, reviewed contracts and supply agreements, and analyzed applicable laws, regulations, and historical practices to identify the limited number of vendors that are critical to the continued and uninterrupted operation of the Debtors' business—the loss of which could materially harm their business, shrink their market share, reduce their enterprise value, and impair going-concern viability.

52.     The Debtors rely on timely and frequent delivery of critical inventory items, goods, and services and any interruption in this supply—however brief—would disrupt the Debtors' operations and could potentially cause irreparable harm to their businesses, goodwill, employees, customer base, and market share.  Such harm would likely far outweigh the cost of payment of the 503(b)(9) Claims and the Critical Vendor Claims.  I believe that the relief requested in the Vendor Motion will allow the Debtors to preserve stakeholder value by paying the prepetition claims of certain counterparties that are critical to the Debtors' business enterprise.  I believe that the relief requested in the Vendor Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in

chapter 11.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Critical Vendors Motion.

IX.     **Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Their Obligations Under Insurance Policies Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, (B) Renew, Supplement, Modify, Purchase or Replace Insurance Coverage, (C) Continue to Pay Workers' Compensation Coverage Premiums, (D) Honor the Terms of the Financing Agreement and Pay Premiums Thereunder, and (II) Granting Related Relief (the "Insurance Motion").**

53.     The Debtors seek entry of interim and final orders:  (a) authorizing the Debtors to (i) continue honoring their obligations under the Insurance Policies and satisfy payment of prepetition obligations related thereto, including the payment of related Broker's commission; (ii) renew, supplement, modify, purchase, or replace insurance coverage in the ordinary course of business on a postpetition basis; (iii) pay the Workers' Compensation Coverage Premiums; and (iv) honor the terms of the Financing Agreement and pay premiums thereunder; including the payment of related Broker's commission, and (b) granting related relief.

54.     The Debtors' Insurance Policies and Worker's Compensation Program are essential to the preservation of the value of the Debtors' business, properties, and assets.  I understand that, in many cases, insurance coverage such as that provided by the Insurance Policies is required by diverse regulations, laws, and contracts.  Failure to make the payments required by the Debtors' Insurance Policies, including the Financing Agreement, could have a significant negative impact on the Debtors' operations.

55.     The Debtors maintain the Workers' Compensation Program for their employees at the statutorily required level for each jurisdiction in which the Debtors have employees.  The insurance coverage for the Workers' Compensation Program is maintained through Federal Insurance Company.  The Debtors are required to maintain the Workers' Compensation Program under the laws of the states in which the Debtors operate.  The Debtors pay approximately

20

$1.1 million per year in Workers' Compensation Coverage Premiums through 10 installment payments[5] to fund the Workers' Compensation Program.  As of the Petition Date, the Debtors believe they are current with payments due under the Workers' Compensation Coverage Premiums.

56.     I believe that the relief requested in the Insurance Motion is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**X.     Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief (the "Taxes Motion").**

57.     The Debtors request: (a) authority to negotiate, remit, pay (or use tax credits to offset) or otherwise satisfy undisputed amounts owed on account of the Taxes and Fees in the ordinary course of business that are payable or become payable during the pendency of these chapter 11 cases (including those obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Petition Date); and (b) related relief.

58.     In the ordinary course of business, the Debtors collect, incur and pay certain Taxes and Fees and remit such Taxes and Fees to various Authorities.  The Debtors must continue to pay the Taxes and Fees to avoid potential costly distractions during these chapter 11 cases. Specifically, the Debtors' failure to pay the Taxes and Fees could adversely affect the Debtors' estate because the governmental authorities could file liens or seek to lift the automatic stay.

---

[5]     The Workers' Compensation Coverage Premiums are included in the premium payments on account of the non-financed Insurance Policies.

10014668.v4

59.     I believe that the relief requested in the Taxes Motion is in the best interests of the

Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to

continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of

the Debtors, I respectfully submit that the Taxes Motion should be approved.

**XI.     Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor, (B) File a Consolidated List of the Debtors' 30 Largest Unsecured Creditors, (C) Redact Certain Personal Identification Information, and (II) Granting Related Relief (the "Creditor Matrix Motion").**

60.     Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an

order:  (a) authorizing the Debtors to (i) file a consolidated list of creditors in lieu of submitting a

separate mailing matrix for each Debtor; (ii) file a consolidated list of the Debtors' 30 largest

unsecured creditors in lieu of filing lists for each Debtor; (iii) redact certain personal identification

information; and (b) granting related relief.

61.     Although I understand that a list of creditors usually is filed on a debtor-by-debtor

basis, in a complex chapter 11 bankruptcy case involving more than one debtor, the debtors may

file a consolidated creditor matrix "in the interest of justice."  Requiring the Debtors to segregate

and convert their computerized records to a Debtor-specific creditor matrix format would be an

unnecessarily burdensome task and result in duplicate mailings.[6]

62.     Additionally, I believe that it is appropriate to authorize the Debtors to file a single

Top 30 List, in lieu of the requirement for each Debtor to file a separate Top 20 List, because the

Top 20 Lists of the Debtors could overlap and certain Debtors may have fewer than twenty

significant unsecured creditors.  Therefore, filing separate Top 20 Lists for each Debtor would be

---

[6]     The Debtors submit that if any of these chapter 11 cases converts to a case under chapter 7 of the Bankruptcy Code, the applicable Debtor will file its own creditor mailing matrix.

of limited utility.  Moreover, I believe that the exercise of compiling separate Top 20 Lists for each individual Debtor could consume an excessive amount of the Debtors' and their advisors' limited time and resources.  I believe that the Top 30 List will aid the U.S. Trustee in any efforts to communicate with creditors listed thereon.

63.     Additionally, I believe that it is appropriate to authorize the Debtors to redact from the Creditor Matrix address information of individual creditors—including the Debtors' employees and temporary workers because such information could be used to perpetrate identity theft or locate survivors of domestic violence, harassment, stalking, or phishing scams.  The Debtors propose to provide an unredacted version of the Creditor Matrix to the Court, the U.S. Trustee, counsel to any official committee of unsecured creditors appointed in these chapter 11 cases, and any party in interest upon a request to the Debtors (email is sufficient) or to the Court that is reasonably related to these chapter 11 cases.

64.     Accordingly, I respectfully submit that the Court should approve the Creditor Matrix Motion.

## XII.     Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief (the "Customer Programs Motion").

65.     Pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to maintain and administer their Customer Programs as described in the Customer Programs Motion and honor certain prepetition obligations related thereto and (b) granting related relief.

66.     The Debtors have historically provided certain incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships.  The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors'

23

business and the value of their brand.  Accordingly, maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these chapter 11 cases, and is necessary to maximize value for the benefit of all of the Debtors' stakeholders.

67.     From time to time, the Debtors issue credits, adjustments, discounts, or other similar obligations to their customers, the vast majority of which ***do not*** entail the expenditure of cash.

68.     As more fully described in the Customer Programs Motion, The Debtors offer certain customers rebates in the ordinary course of business (each, a "Rebate," and collectively, the "Rebates").  Through the Rebate incentives, the Debtors provide their customers with concessions that are earned as a percentage of sales, or through another contractually agreed formula, on a monthly basis.  Typically, the customers pay the gross amount of an invoice and later receive the benefit of the Rebates through a reduction of the customer's current receivables. Such Rebates are generally cleared monthly or quarterly.

69.     The Rebates encourage existing customers to maintain certain purchasing volumes and other purchasing targets and continue their business with the Debtors.  The Debtors' ability to continue the Rebates and to honor the obligations thereunder in the ordinary course of business is critically important to the Debtors' reputation and the uninterrupted continuation of their services to customers.  Without the ability to continue offering Rebates, certain customers may be unwilling to transact with the Debtors or purchase at high volumes, which could lead to a decline in revenues, the ultimate cost of which would be borne by the Debtors' estates.

70.     The Debtors also offer Discounts and Incentives to their customers.  Specifically, the Debtors agree to provide special rates or credits to their customers, which, if not honored, could result in customers asserting claims against the Debtors on account of prepetition obligations.  For

example, the Debtors provide preferred pricing to certain customers who maintain or exceed a particular volume of sales or purchase growth percentage.  The discounted rates are "locked in" upon the customer's enrollment and applied to all of the customer's purchases during the period so long as the customer's sales volume or growth percentage does not fall below the minimum required annual rate.  The Debtors also offer a number of billback programs to their indirect customers who buy the Debtors' products indirectly through distributors (collectively, the "Billback Programs").  In certain cases, the Debtors have negotiated prices with these indirect customers that are less than prices to distributors.  In these certain cases, distributors receive an amount equal to the distributors' gross price less indirect customers negotiated prices.  These Billback Programs are an essential part of Debtors' business.  Additionally, the Debtors offer prompt payment discounts to certain customers for paying invoices by a contractually agreed upon date.

71.     I believe that continuing to administer the Customer Programs without interruption during the pendency of the chapter 11 cases will help preserve the Debtors' valuable customer relationships and goodwill, which will inure to the benefit of all of the Debtors' creditors and benefit their estates.  In contrast, if the Debtors are unable to continue the Customer Programs postpetition, the Debtors risk alienating certain customers (who might then initiate business relationships with the Debtors' competitors) and might suffer corresponding losses in customer loyalty and goodwill that will harm their prospects maximizing the value of their estates.  The Debtors' Customer Programs are essential marketing strategies for attracting new customers.

72.     I believe that the failure to honor the Customer Programs could place the Debtors at a competitive disadvantage in the marketplace, amplifying the negative effect of customer uncertainty that may arise from the chapter 11 filings.  Such uncertainty could erode the Debtors'

hard-earned reputation and brand loyalty, which, in turn, could adversely impact their prospects for a successful emergence from bankruptcy.

73.     I believe that the relief requested herein is vital to the long-term reorganization of their business, both in terms of profitability and the engendering of goodwill, particularly at this critical time following the filing of the chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Customer Programs Motion.

*[Remainder of page intentionally left blank]*

26