IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| GOLD STANDARD BAKING, LLC, *et al.*,[1] | ) Case No. 22-10559 (___) |
| Debtors. | ) (Joint Administration Requested) |

**DECLARATION OF RYAN SANDAHL IN SUPPORT OF
CASH COLLATERAL AND DIP MOTION**

Ryan Sandahl, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1. I am a Managing Director of Houlihan Lokey Capital, Inc. ("Houlihan Lokey"), the proposed investment banker to the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") in these Chapter 11 Cases[2], and I am authorized to make this declaration (the "Declaration").

2. I submit this Declaration in the above-captioned Chapter 11 Cases in support of the *Motion of the Debtors for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364 and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to § 364 of the Bankruptcy Code; (II) Authorizing Use of Cash Collateral Pursuant to § 363 of the Bankruptcy Code; (III) Granting Liens and Super-Priority Claims; (IV) Granting Adequate Protection to the Prepetition Secured*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Gold Standard Baking, LLC (8756); Gold Standard Holdings, Inc. (0787); and Gold Standard Real Estate, LLC (6528). The location of the Debtors' service address is 3700 S. Kedzie Avenue, Chicago, Illinois 60632.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms as set forth in the *Declaration of John T. Young, Jr., Chief Restructuring Officer of Gold Standard Baking, LLC, in Support of Chapter 11 Petitions and First Day Motions (the "First Day Declaration")* filed contemporaneously herewith and fully incorporated herein.

*Party and DIP Facility Lender; and (V) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c)* (the "Cash Collateral and DIP Motion") filed contemporaneously herewith.[2]

3. All facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my direction or supervision, my discussions with other members of Houlihan Lokey or the Debtor's directors, management or advisors, my discussions with potential purchasers of the Debtor's assets and other interested parties, or my opinion based upon experience, knowledge, and information concerning asset sales and financings in distressed situations. If called upon to testify, I could and would testify competently to the facts set forth herein.

**A.    Background Regarding Houlihan Lokey and My Experience**

4. Houlihan Lokey, together with the other subsidiaries of its direct parent company, Houlihan Lokey, Inc., is an internationally recognized investment banking and financial advisory firm, with twenty-six offices worldwide and more than 1,600 professionals. Houlihan Lokey's Financial Restructuring Group, which has more than 200 professionals, is one of the leading advisors and investment bankers to debtors, unsecured and secured creditors, acquirers, and other parties-in-interest involved with financially troubled companies both in and outside of bankruptcy. Houlihan Lokey has been, and is, involved in some of the largest restructuring cases in the United States, including representing debtors and official committees in numerous chapter 11 cases in this and other Districts.

5. Since joining Houlihan Lokey in 2005, I have specialized in assisting companies, lenders, creditors, and investors in distressed situations. My experience includes conducting acquisitions and divestitures of financially troubled assets, raising various forms of capital and negotiations relating to the restructuring of private and public securities, both in chapter 11 and in

10046303.v4

out-of-court situations. Before joining Houlihan Lokey, I was an Associate in PricewaterhouseCoopers' corporate finance group. Before that, I was an Analyst in Bank of America's portfolio management group. I hold a B.A. in Economics with a second major in Finance from Washington University in St. Louis.

6. The Debtors retained Houlihan Lokey on June 2, 2020 to serve as their financial advisor and investment banker. The Debtors chose Houlihan Lokey because of our expertise selling manufacturing businesses and assets in the food industry, including the bakery sector in particular, as well as on issues relating to financially distressed companies and its extensive experience acting as an advisor in both in and out-of-court restructurings of companies of all sizes across a wide array of industries. Houlihan Lokey and its professionals have considerable experience advising debtors in chapter 11 cases and have been employed as an estate compensated professional in various capacities in numerous chapter 11 cases within this District and others.

**B.    The Cash Collateral and DIP Motion**

7. As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $140 million, approximately $88.0 million of which is outstanding to the Prepetition Secured Party under the Prepetition Credit Documents (each as defined in the Cash Collateral and DIP Motion), approximately $16.3 million of which is outstanding under the Second Lien Loan Agreement (defined in the Cash Collateral and DIP Motion) and $35.4 million of which is outstanding under certain unsecured subordinated note, and unsecured trade debt of approximately $6.9 million. I understand that the Debtors prepetition first lien obligations to the Prepetition Secured Party are secured by liens on substantially all of the Debtors' assets and proceeds thereof.

8.　　　As detailed in the First Day Declaration, the Debtors commenced the chapter 11 cases to preserve value for its stakeholders, including their vendors, customers, and employees and to seek maximize the value of their estates through a continued marketing and sale process for their assets as a going concern. Additionally, the Debtors have negotiated a debtor-in-possession financing facility that is intended to allow the Debtors to continue to operate in the normal course, pay vendors, and have sufficient liquidity to pay the administrative costs, both operational and statutory, required in these chapter 11 cases.

9.　　　Leading up to the Petition Date, the Debtors and the Prepetition Secured Party and DIP Facility Lender engaged in arm's-length negotiations over the terms of the DIP Facility, as well as the terms of the proposed sale transaction.  Given the Debtors' capital structure and under the current circumstances, the only viable, actionable source of debtor-in-possession financing was with the Prepetition Secured Party and DIP Facility Lender.  Based upon my experience, any potential lenders, if any were to make a financing proposal at all, would require priming of the existing secured parties.  Furthermore, the Prepetition Secured Party and DIP Facility Lender made it known that it would not consent to a priming loan from a third-party. In my experience, any such attempt, even if actionable by the Debtors, would likely result in expensive and distracting litigation at the outset of these chapter 11 cases that the Debtors do not have the requisite financing to support.

10.　　　Further, with any third-party proposal, the Debtors would incur the execution risk associated with a new lender transaction, including timing and due diligence constraints, necessarily involving the payment of additional professional fees.  In contrast, the proposed consensual DIP Facility and access to Cash Collateral offered by the Prepetition Secured Party and DIP Facility Lender allows the Debtors to avoid such risks at the outset of these chapter 11 cases.

11. Based on the foregoing, the Debtors believe, and I agree, that the DIP Facility and consensual use of Cash Collateral represents the best (and likely only) financing option available under the circumstances, particularly given the nature of the Stalking Horse Bid. It is also my belief that the economic terms of the DIP Facility are customary for debtor-in-possession financings of this type and were the product of arm's-length negotiations with the Prepetition Secured Party and DIP Facility Lender.

12. The DIP Facility and access to Cash Collateral will provide the Debtors with immediate access to liquidity. The Debtors believe that obtaining access to the financing under the DIP Facility and the use of Cash Collateral with the support of all of the holders of the Debtors' funded debt will send a positive signal to the Debtors' employees, vendors, suppliers, and customers that the Debtors will be able to continue to meet their commitments and are not likely to languish in bankruptcy, which the Debtors believe will facilitate a successful sale in these Chapter 11 Cases.

13. The Debtors have filed the Cash Collateral and DIP Motion, which requests that the Court approve the DIP Facility provided by the DIP Facility Lender as well as the use of Cash Collateral. As noted above and outlined in the First Day Declaration, absent debtor-in-possession financing, the Debtors lack sufficient liquidity to continue to operate their businesses while in chapter 11 and to continue to market their assets to effectuate a section 363 sale. The Debtors therefore need the relief requested in the Cash Collateral and DIP Motion, including access to the DIP Facility and use of Cash Collateral, in order to: (a) continue their ordinary course, day-to-day operations, including satisfying payroll obligations; (b) meet their ongoing obligations with trade vendors and customers; (c) satisfy the administrative expenses of their Chapter 11 Cases; and (d) continue to market their business for sale as a going concern.

14. Based on the facts set forth above, I agree with the Debtors' conclusion that the proposed DIP Facility is the only viable option available for the Debtors to obtain postpetition financing. Based on the circumstances outlined above and in the First Day Declaration, the Debtors would be unable to obtain alternative debtor-in-possession financing on an unsecured basis or on a superpriority basis on economic terms more favorable than the proposed DIP Facility. In addition, I believe that financing secured by liens on the Debtors unencumbered assets (which I understand are virtually nonexistent) or junior liens on their encumbered assets would similarly be unattainable.

15. Further, it is my view, based on my experience advising similarly situated companies, that the terms of the proposed DIP Facility are customary for this type of financing.

16. In sum, based on the foregoing, I believe, based on my experience advising similarly situated companies, that under the circumstances (a) no alternative reasonable and actionable debtor-in-possession financing would be available to the Debtors on economic terms more favorable than those of the proposed DIP Facility, (b) the terms of the proposed DIP Facility are customary for this type of financing, and (c) access to the DIP Facility and the consensual use of Cash Collateral is necessary for the Debtors to continue to operate their business during these Chapter 11 Cases and to fund chapter 11 administrative expenses.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: June 22, 2022

*/s/   Ryan Sandahl*
Ryan Sandahl, Managing Director
Houlihan Lokey Capital, Inc.