**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| GOLD STANDARD BAKING, LLC, *et al.*,[1] | Case No. 22-10559 (JKS) |
| Debtors. | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR ENTRY OF: (I) AN ORDER (A) APPROVING BID PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL ASSETS, (B) SCHEDULING AN AUCTION AND A SALE HEARING, (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) AUTHORIZING ENTRY INTO THE STALKING HORSE AGREEMENT, (E) APPROVING BID PROTECTIONS, (F) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (G) GRANTING RELATED RELIEF; AND (II) AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors") hereby move this Court (this "Motion"), pursuant to sections 105(a), 363, 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"); Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedures of the Bankruptcy Court for the District of Delaware (the "Local Rules"), for the entry of the following: (i) an order, substantially in the form attached hereto as **Exhibit B** (the "Bid Procedures Order"), (a) approving procedures in connection with the potential sale of substantially all of the assets of Gold Standard Baking, LLC'("Seller") substantially in the form attached to the Bid Procedures Order as **Exhibit 1** (the "Bid Procedures"),

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Gold Standard Baking, LLC (8756); Gold Standard Holdings, Inc. (0787); and Gold Standard Real Estate, LLC (6528).  The location of the Debtors' service address is 3700 S Kedzie Avenue, Chicago, Illinois 60632.

(b) scheduling the auction and hearing to consider approval of the Sale (as defined below), (c) approving the form and manner of notice thereof, (d) authorizing Seller to enter into the Stalking Horse Agreement (as defined below), (e) approving certain bid protections for the Stalking Horse Bidder (as defined below), (f) approving procedures related to the assumption and assignment of certain executory contracts and unexpired leases, and (g) granting related relief; and (ii) an order, substantially in the form attached hereto as **Exhibit C** (the "Sale Order"), (x) approving the Sale of the Assets (as defined below) free and clear of all liens, claims, encumbrances, and other interests (except certain assumed liabilities as set forth in the Stalking Horse Agreement), (y) approving the assumption and assignment of certain executory contracts and unexpired leases related thereto, and (z) granting related relief.

In support of this Motion, the Debtors rely upon the *Declaration of John T. Young, Jr. in Support of Chapter 11 Petitions and First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference.  This Motion also is supported by the *Declaration of Ryan Sandahl in Support of the Bid Procedures and Sale Motions* (the "Bid Procedures Declaration"), filed contemporaneously herewith and incorporated herein by reference.[2]  In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.    The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f), to the entry of a final order by the Bankruptcy Court in connection with

---

[2]    The Debtors also will file a declaration in advance of the Sale Hearing regarding entry of the Sale Order.

this motion to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.    This is a core proceeding under 28 U.S.C. § 157(b).

3.    Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4.    The statutory predicates for the relief requested in this Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014 and Local Rules 2002-1, 6004-1, and 9013-1(m).

## BACKGROUND

### A.    Chapter 11 Cases

5.    On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition in this Court commencing a case for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

6.    The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the First Day Declaration, which is fully incorporated herein by reference.[3]

7.    The Debtors have sought procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

8.    The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

---

[3]    Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the First Day Declaration.

3

9.      No trustee or examiner has been requested in the Chapter 11 Cases, and no official

committee of unsecured creditors (the "Committee") has been appointed in these Chapter 11 Cases

by the United States Trustee for the District of Delaware (the "U.S. Trustee") to date.

**B.      The Sale and Marketing Process**

10.      The Debtors engaged Houlihan Lokey on June 2, 2020 as financial advisor and

investment banker in connection with the review and analysis of the Debtors' strategic alternatives.

During this process, Houlihan Lokey worked closely with the disinterested directors of the board

who were delegated the authority to review and act upon any matters pertaining to a potential

restructuring or refinancing transaction in which a conflict may exist between the Debtors and their

equity holders, affiliates, or their managers, directors, or officers (the "Disinterested Directors")

and the Debtors' senior management, as well as the entire board of directors and the Debtors' other

advisors. This process also included the Debtors' then-existing lenders and their retained advisors

to evaluate potential strategic alternatives and financing options. After considering the reasonably

available possible courses of action, the Debtors determined that a sale of its assets was in the best

interest of the Debtors, its creditors, and all parties in interest under the circumstances, particularly

considering the Debtors' liquidity constraints and the difficulties in raising additional debt or

equity financing.

11.      Houlihan Lokey expended significant efforts prior to the Petition Date marketing

the Assets for sale. Houlihan Lokey's marketing process included significant mailings and calls to

targeted, industry specific, potential buyers that Houlihan Lokey and the Debtors believed might

be interested in discussing a potential purchase of the Assets. Specifically, on July 6, 2021,

Houlihan spearheaded outreach to a broad universe of relevant strategic and financial parties to

assess interest in an acquisition of the Company. Houlihan contacted approximately 102 parties,

4

71 of which negotiated and executed confidentiality agreements and, starting July 13, 2021, were provided with a CIM and access to a virtual data room containing detailed information about the Debtors' business.  Houlihan then held numerous calls with interested parties to respond to diligence and discuss the current situation and process.

12.     The Debtors received six written indications of interest by the July 29, 2021 deadline, with three additional parties submitting a written indication of interest by August 6, 2021. Of these nine parties, four were strategic companies and five were financial investors. After reviewing all nine formal indications of interest and in consultation with their advisors, the Debtors' management team invited six of the parties to further discuss the possibility of a potential transaction in advance of the deadline to submit a final bid on September 9, 2021. Subsequently, two of those parties submitted a formal letter of intent to purchase substantially all of the Debtors' assets, one on September 9, 2021 and the other on September 15, 2021.  Multiple additional parties indicated a potential interest in a sale transaction but did not submit a formal letter of intent.

13.     As part of evaluating the received letters of intent as well as the formal and informal discussions with potential purchasers, it was apparent to the Debtors that certain potential purchasers were interested in purchasing only a portion of the Debtors' business. As a result, the Debtors and their advisors determined that a sale of portions of the Debtors' business to multiple purchasers could potentially maximize value as compared to the distributable value that would inure to the estates from any one purchaser of the Debtors' full business operations. The Debtors' advisors consulted with advisors to the Lenders and the holders of the Senior Subordinated Notes and determined to re-contact parties that had previously expressed informal and/or initial indications of interest to gauge interest in a potential purchase of some, but not all, of the Debtors'

business. The Debtors also re-engaged additional parties to further survey potential interest in a sale of all of the Debtors' business.

14.     On October 4, 2021, Arbor Investments Management, LLC and Crown Bakeries, LLC (collectively, "Arbor") submitted a formal letter of intent for the purchase of the Wisconsin Facility with a contemplated closing of November 1, 2021. The Debtors and their advisors subsequently engaged in further discussions with Arbor regarding the terms of the proposed sale. Following several weeks of negotiations, on December 10, 2021, the Debtors consummated the Wisconsin sale transaction with Arbor.

15.     While discussions with Arbor remained ongoing, the Debtors and their advisors continued to evaluate value-maximizing paths forward for the Chicago Facility. Over the last twenty-four months, the Debtors engaged in continuous communication with their lenders, entered into several rounds of forbearance negotiations, and evaluated multiple possible sale transactions and other out-of-court deals, including the shutdown of the Chicago Facility and piecemeal liquidation of its assets.

16.     Through March and April of 2022, the Initial Lenders explored the potential for the sale of its First Lien Obligations and the assignment of the First Lien Documents. Ultimately, on April 26, 2022, 37 Baking Holdings, LLC acquired all the rights of the Initial Lenders and the Agent under the First Lien Credit Documents pursuant to that certain Loan and Collateral Purchase Agreement the Agent, Initial Lenders and 37 Baking Holdings, LLC dated as of April 26, 2022.

17.     After the acquisition of the First Lien Obligations and First Lien Documents by 37 Baking Holdings, LLC, discussions with the Company continued with respect to viable options for the Chicago Facility. Ultimately, 37 Baking Holdings, LLC agreed to serve as the stalking horse bidder (the "Stalking Horse Bidder") pursuant to the terms of that certain asset purchase

agreement, dated June 17, 2022 (the "Stalking Horse Agreement") attached to the Sale Order as **Exhibit A** (the "Stalking Horse Agreement") to acquire the Debtors' remaining assets at the Chicago Facility as a going concern, to expose the staking horse agreement to higher and better offers through a chapter 11 process, and to support the process by agreeing to the Debtors' use of cash collateral and providing needed debtor-in-possession financing.

18.     The culmination of the foregoing marketing process was the execution of the Stalking Horse Agreement.

19.     The timeline for the formal marketing process was driven by parallel negotiations with the Prepetition Secured Party and the DIP Facility Lender[4] as part of the prepetition restructuring process.  As part of these negotiations, the Prepetition Secured Party and the DIP Facility Lender, among other things, insisted on the inclusion of "milestone" dates by which the Debtors would be required to have completed certain aspects of the proposed sale process (the "Milestones").  These Milestones are intended to preserve the going-concern value of the business through a timely, efficient sale process that culminates in a closing by the middle of August 2022 to maximize value and avoid disruption and harm to the Debtors' business.

20.     Although the Debtors believe that the Assets were adequately marketed before the Petition Date, pursuant to the terms of the Stalking Horse Agreement, the Debtors and their investment banker have continued, and will continue, to market the Assets to likely potential buyers through and until the Bid Deadline (defined below).  The Debtors and their investment banker believe that given the amount of the credit bid available to the Prepetition Secured Party and DIP Facility Lender (which such amount far exceeds any reasonable valuation of the Assets),

---

[4]     "Prepetition Secured Party" and "DIP Facility Lender" means 37 Baking Holdings, LLC in its capacity as the Debtors' pre-petition senior secured lender and post-petition debtor-in-possession lender, respectively.

the significant prepetition marketing effort, the number of parties that already have executed NDAs, the fact that the Assets were already marketed to the most likely bidders for Assets of the type being sold, and that the Debtors entered into a liquidation agreement for the Assets prior to the Stalking Horse Bidder's willingness to enter into the Stalking Horse Agreement and buy the Assets as a going concern compared with other alternatives explored, the prepetition and postpetition marketing process leading up the Bid Deadline will be robust and adequate to achieve the greatest possible level of interest and consideration for the Assets in the Chapter 11 Cases.

### C.    Summary of the Proposed Transaction and Bid Procedures

21.    Under the terms of the Stalking Horse Agreement, the Stalking Horse Bidder will purchase the Assets for an aggregate purchase price consisting of: (i) a credit bid in the amount of a portion of the First Lien Obligations in the amount of $20 million; (ii) assumption of certain assumed liabilities as provided in the Stalking Horse Agreement (including the DIP Financing Obligations); and (iii) the assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder (each term as defined in the Stalking Horse Agreement).

22.    The Debtors and their advisors developed the Bid Procedures to be flexible, transparent, and competitive in order to attain the highest or otherwise best price for the business under the circumstances.  Under the Bid Procedures, qualified parties may submit bids that will be analyzed by the Debtors and their professionals, which will culminate in the Debtors designating the Stalking Horse Bidder or other Qualified Bidder as the Successful Bidder to purchase the Assets (or a portion thereof).  The Debtors believe that the Bid Procedures, in connection with the Stalking Horse Agreement, will provide the best opportunity to consummate a value-maximizing transaction that also secures employment for the Debtors' employees and preserves the going-concern value of the enterprise.

23.     Given the lengthy prepetition marketing process and the level of engagement with interested parties prepetition, the Debtors believe that it is critical and warranted that the sale process be consummated on the timeline set forth in the Bid Procedures and this Motion to allow the Debtors to satisfy the Milestones under the Stalking Horse Agreement.  The sale timeline was specifically designed to balance the goals of (a) continuing a marketing process, and (b) preserving and maximizing the value of the Assets, while also considering the size of the Prepetition Secured Party's available credit bid, the reasonably anticipated market value of the Assets, and the value deteriorating cost of a protracted Chapter 11 sale process.

## **RELIEF REQUESTED**

24.     By this Motion, first, the Debtors seek entry of the Bid Procedures Order substantially in the form attached hereto as **Exhibit B**:

(a)     authorizing and approving the Bid Procedures attached to the Bid Procedures Order as **Exhibit 1** in connection with the sale (the "Sale") of the Assets;

(b)     scheduling an auction (the "Auction") and sale hearing (the "Sale Hearing") with respect to the Sale of the Assets;

(c)     approving the form and manner of notice of the Auction and the Sale Hearing, a copy of which is attached to the Bid Procedures Order as **Exhibit 2** (the "Sale Notice");

(d)     authorizing the Seller to enter into the Stalking Horse Agreement with the Stalking Horse Bidder, subject to ultimate Bankruptcy Court approval at the Sale Hearing, pursuant to which the Stalking Horse Bidder seeks to purchase the Assets pursuant to the consideration set forth therein;

(e)     approving certain bid protections as set forth in the Stalking Horse Agreement, consisting of:

(i)     a break-up fee of **$250,000.00** (the "Break-Up Fee");

(iii)     expense reimbursement of the Stalking Horse Bidder's actual, out-of-pocket legal fees and hard costs incurred after execution of Stalking Horse Agreement of up to **$350,000.00** (the "Expense Reimbursement"); and

9

(iii)  an initial overbid equal to the Break-Up Fee, <u>plus</u> the Expense Reimbursement, <u>plus</u> **$200,000.00** (the "<u>Initial Overbid</u>" and, together with the Break-Up Fee and the Expense Reimbursement, the "<u>Bid Protections</u>").

(f)  approving procedures for the assumption and assignment (as set forth in the Bid Procedures Order, the "<u>Assumption Procedures</u>") of certain executory contracts and unexpired leases in connection with the Sale (collectively, the "<u>Assumed Contracts</u>"); and

(g)  granting related relief.

25.  Second, the Debtors intend to seek entry of the Sale Order at the Sale Hearing in substantially the form attached hereto as **<u>Exhibit C</u>**, providing the following relief:

(a)  if an Auction is conducted, authorizing and approving the sale of the Assets to the Qualified Bidder (as defined in the Bid Procedures) that the Debtors determine has made the highest and best Qualified Bid (as defined in the Bid Procedures) for some or all of the Assets (the "<u>Successful Bidder</u>") (or, if the Successful Bidder fails to consummate the Sale, to the Qualified Bidder with the next-highest or second-best Qualified Bid at the Auction for the Assets (the "<u>Backup Bidder</u>")), free and clear of all liens, claims, encumbrances, and other interests other than the Permitted Liens and the Assumed Liabilities (as defined in the Stalking Horse Agreement);

(b)  if an Auction is not conducted, authorizing and approving the Sale of the Assets to the Stalking Horse Bidder free and clear of liens, claims, encumbrances, and other interests, other than the Permitted Liens and the Assumed Liabilities;

(c)  authorizing the assumption and assignment of the Assumed Contracts; and

(d)  granting any related relief.

**STALKING HORSE AGREEMENT**

26.  The key terms of the proposed transaction can be found in the Stalking Horse Agreement attached to the Sale Order as **<u>Exhibit A</u>**.  The material terms of the Stalking Horse Agreement, including those provisions required to be highlighted pursuant to Local Rule 6004-1(b)(iv), are as follows:

10

| MATERIAL TERMS OF STALKING HORSE AGREEMENT[5] | |
|---|---|
| **Purchase Price / Consideration** | In consideration of the sale of the Assets to Purchaser, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for the sale and transfer hereunder (the "Purchase Price") consisting of: <br><br>(a)    A credit bid pursuant to section 363(k) of the Bankruptcy Code (the "Credit Bid") in the amount of a portion of the First Lien Obligations in the amount of $20 million, provided, however, that Purchaser reserves the right, in its sole discretion, to increase the Credit Bid up to the full amount of the First Priority Obligations and the DIP Facility Obligations; and <br><br>(b)    The assumption by Purchaser of the Assumed Liabilities; and <br><br>(c)    The assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder (each term as defined in the Stalking Horse Agreement) <br><br>See Stalking Horse Agreement §§ 2.5(a) & (b). |
| **Assets** | Excepting the Excluded Assets, Seller shall sell, assign, transfer, convey, and deliver to Purchaser, and Purchaser shall purchase and assume from Seller, upon the terms and subject to the conditions set forth in this Agreement, and pursuant to sections 105, 363, and 365 of the Bankruptcy Code, on the Closing Date, all of Seller's right, title, and interest in and to all of Seller's properties, assets, and rights of every nature, kind and description, tangible and intangible (including, without limitation, goodwill) used in the ownership, operation, conduct, or Business of Seller, wherever such properties, assets, and rights are located, whether real, personal, or mixed, whether accrued, fixed, contingent, or otherwise (collectively, the "Assets") in each case free and clear of any and all encumbrances, Liens, Claims, rights, remedies or interests, existing as of the Closing, except for the Permitted Liens and the Assumed Liabilities, as approved for sale, transfer, and assignment pursuant to the Sale Order.  The Assets, shall include, without limitation, the following: <br><br>See Stalking Horse Agreement § 2.1. |
| **Assumed Liabilities** | Purchaser shall not assume any Liabilities of Seller, except for: (i) those specifically identified on Schedule 2.3(a) to the Stalking Horse Agreement and (ii) the Liabilities assumed in relation to the Assumed Contracts and the Assumed Permits, including, for the avoidance of doubt and without limitation, any Cure Amounts in respect thereof (collectively, the "Assumed Liabilities"). <br><br>See Stalking Horse Agreement § 2.3. |

---

[5]    All capitalized terms that are used in this summary, but not otherwise defined herein, shall have the meanings set forth in the Stalking Horse Agreement. To the extent there are any discrepancies between the Stalking Horse Agreement and this summary, the terms of the Stalking Horse Agreement shall prevail.

| Sale to Insider (Local Rule 6004-1(b)(iv)(A)) | 37 Baking Holdings, Inc. is an entity formed to acquire the First Lien Obligations and First Lien Documents and is owned by several investment funds and minority-owned by several current GSB employees.  Specifically: |
|---|---|
| | <ul><li>a minority member (who is also a member of the Board of Managers) of 37 Baking Holdings, LLC (the Stalking Horse Bidder) is the Chief Executive Officer of Gold Standard Baking, LLC and was, until June 13, 2022, a member of the board of managers of Debtor Gold Standard Baking, LLC.</li><li>Five other minority investors of 37 Baking Holdings, LLC hold management positions at Gold Standard Baking, LLC as of the Petition Date.</li><li>One additional minority investor of 37 Baking Holdings, LLC (who is also a member of the Board of Managers), is (i) a limited partner of Parallel49 Equity (Fund V), Limited Partnership ("P49"), which is the largest second lienholder on all or substantially all of the Debtors' assets as of the Petition Date and the largest equityholder Gold Standard Investment, LP; (ii) a limited partner of Parallel49 Equity GP (Fund V), Limited Partnership ("P49 GP") which is the general partner of P49; (iv) employed by Parallel49 Equity U.S. Management (Fund V), Inc., which is the management company of P49; and (v) a former director and/or officer of related Debtor entities, including Gold Standard GP, LLC; Gold Standard Investment, LP; Gold Standard Holdings, Inc.; Gold Standard Baking, LLC; and Gold Standard Real Estate, LLC.</li><li>One additional member of the Board of Managers of 37 Baking Holdings, LLC is (i) a limited partner of P49; (ii) a limited partner of P49 GP; and (iii) sits on the Investment Committee for P49 and P49 GP.</li></ul> |
| Agreements with Management (Local Rule 6004-1(b)(iv)(B)) | There are no management agreements between the Stalking Horse Bidder and employees of the Debtors, provided that existing management agreements with the Debtors may be assumed pursuant to the Stalking Horse Agreement. |
| Releases (Local Rule 6004-1(b)(iv)(C)) | Not applicable. |
| Private Sale/No Competitive Bidding (Local Rule 6004-1(b)(iv)(D)) | Not applicable. |
| Closing and Other Deadlines (Local Rule 6004-1(b)(iv)(E)) | The Stalking Horse Agreement sets forth the conditions and terms for the Closing of the sale: |

12

6.2     Bankruptcy Court Milestones; Protections.

(a)     Unless otherwise agreed to by Purchaser in writing, Seller shall comply with the following timeline relating to the transactions contemplated by this Agreement (collectively, the "Bankruptcy Court Milestones"):

(i)     Seller shall commence the Chapter 11 Case on or before June 22, 2022.

(ii)     Seller shall file on the Petition Date with the Bankruptcy Court and shall prosecute in good faith, the Sale Motion and the Bid Procedures Motion (either singularly or combined, and in form and substance acceptable to Purchaser in its sole discretion), in which the Bid Procedures shall be incorporated into the Bid Procedures Order.

(iii)     No later than the sixteenth (16th) day after the Petition Date, (x) the Bankruptcy Court shall have held a hearing to consider entry of the Bid Procedures Order, and (y) Seller shall have obtained entry by the Bankruptcy Court of the Bid Procedures Order and such order shall be in full force and effect and not reversed, modified, or stayed.

(iv)     No later than forty-five (45) days after the Petition Date, (x) the Bankruptcy Court shall have held the Sale Hearing to consider entry of the Sale Order, and (y) Seller shall have obtained entry by the Bankruptcy Court of the Sale Order and such order shall be in full force and effect and not reversed, modified, or stayed.

See Stalking Horse Agreement § 6.2(a).

7.1     Conditions to Seller's Obligation to Close.   Seller's obligation to consummate the transactions contemplated in the Stalking Horse Agreement is subject, at the option of Seller, to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions:

(a)     Representations and Warranties; Covenants.

(i)     All representations and warranties made by Purchaser shall be accurate in all material respects on and as of the Closing Date as if again made by such Purchaser on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date and (ii) inaccuracies that do not result in a material effect on such Purchaser's ability to perform its obligations hereunder.

(ii)     Purchaser shall have performed in all material respects all agreements and covenants required by the Stalking Horse Agreement to be performed by it prior to or at the Closing Date, and Seller shall have received a certificate, dated as of the Closing Date and signed by an authorized Representative of Purchaser, to that effect.

13

(b)      No Injunction.  No injunction, stay, or restraining order shall be in effect prohibiting the consummation of the transactions contemplated in this Agreement.

(c)      Sale Order.  The Bankruptcy Court shall have entered the Sale Order.

(d)      Purchaser's Deliveries.   Purchaser shall have duly executed and delivered to Seller each of the documents, instruments and agreements required to be delivered pursuant to Section 7.3(b) of the Stalking Horse Agreement.

See Stalking Horse Agreement § 7.1

7.2      Conditions to Purchaser's Obligation to Close.  Purchaser's obligation to consummate the transactions contemplated in the Stalking Horse Agreement is subject, at the option of Purchaser, to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions:

(a)      Representations and Warranties; Covenants.

(i)      All representations and warranties made by Seller shall be accurate in all material respects on and as of the Closing Date as if again made by Seller on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(ii)      Seller shall have performed in all material respects all agreements and covenants required by the Stalking Horse Agreement to be performed by Seller prior to or at the Closing Date, and Seller shall have delivered to Purchaser a certificate, dated as of the Closing Date and signed by an authorized Representative of Seller, to that effect.

(b)      Seller's Deliveries.  Seller shall have duly executed and delivered to Purchaser each of the documents, instruments, and agreements required to be delivered by Seller pursuant to the Stalking Horse Agreement.

(c)      Material Adverse Effect.   From the date of the Stalking Horse Agreement until the Closing Date, there shall not have occurred and be continuing a Material Adverse Effect.

(d)      Sale Order.  The Bankruptcy Court shall have entered the Sale Order in form and substance satisfactory to Purchaser, and such other shall not be stayed, enjoined, restrained, or subject to appeal in any way.

(e)      No Injunction or Challenge.  No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated in the Stalking Horse Agreement.  No Law, ordinance or regulation shall have been enacted, and no order, judgment, or decree shall have been enacted or rendered by a Governmental Entity or any other Person (and not subsequently dismissed, settled, withdrawn or terminated, nor shall any petition, complaint, or action have been filed or be pending that seeks such order, judgment or

14

<table>
<tr><td></td><td>decree) which would prevent the consummation at the Closing of, or restrain or invalidate, the transactions contemplated by the Stalking Horse Agreement.

(f)     Assumption of Critical Contracts.    Each of the critical Contracts or Leases identified on Schedule 7.2(f) have been assumed by Seller and assigned to Purchaser prior to or as of the Closing Date.

(g)     Assumption or Transfer of Critical Permits.    Each of the critical licenses or permits identified on Schedule 7.2(g) have been assumed by Seller and assigned to Purchaser prior to or as of the Closing Date.

(h)     Assumption of Critical Intellectual Property Licenses.    Each of the Critical Intellectual Property Licenses have been assumed by Seller and assigned to Purchaser prior to or as of the Closing Date.

See Stalking Horse Agreement § 7.2.</td></tr>
<tr><td>**Good Faith Deposit (Local Rule 6004-1(b)(iv)(F))**</td><td>Not Applicable as to the Stalking Horse Bidder.</td></tr>
<tr><td>**Interim Arrangements with Proposed Buyer (Local Rule 6004-1(b)(iv)(G))**</td><td>The Stalking Horse Agreement sets forth customary provisions regarding the Debtors' conduct of its business pending the Closing Date.

See Stalking Horse Agreement § 5.2(d).</td></tr>
<tr><td>**Use of Proceeds (Local Rule 6004-1(b)(iv)(H))**</td><td>As the Purchase Price contemplates only a credit bid and an assumption of liabilities, the Stalking Horse Agreement does not contemplate any sale proceeds; but in the event there are any, they shall be used to repay the First Priority Obligations and the DIP Facility Obligations.</td></tr>
<tr><td>**Tax Exemption (Local Rule 6004-1(b)(iv)(I))**</td><td>Applicable law shall apply.</td></tr>
<tr><td>**Record Retention (Local Rule 6004-1(b)(iv)(J))**</td><td>From and after the Closing, Purchaser shall promptly provide to Seller and its representatives (after reasonable notice and during normal business hours and without charge to Sellers) access to all business records included in the Assets for periods prior to the Closing and reasonable access to Transferred Employees to the extent such access is necessary in order for Seller to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality, and shall preserve such business records until the latest of (i) seven years after the Closing Date, (ii) the required retention period for all government contact information, records or documents, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Case or (iv) in the case of business records related to Taxes, the expiration of the statute of limitation applicable to such Taxes.

See Stalking Horse Agreement § 6.8</td></tr>
<tr><td>**Sale of Avoidance Actions**</td><td>The Assets include Avoidance Actions.</td></tr>
</table>

| (Local Rule 6004-1(b)(iv)(K)) | <u>See</u> Stalking Horse Agreement § 2.1.(k). |
|---|---|
| **Requested Findings as to Successor Liability (Local Rule 6004-1(b)(iv)(L))** | The proposed Sale Order shall include a finding that the Sale of the Assets shall not subject Purchaser or its designee(s) to any liability whatsoever (including any successor liability).<br><br><u>See</u> Stalking Horse Agreement, definition of "Sale Order." |
| **Sale Free and Clear of Unexpired Leases (Local Rule 6004-1(b)(iv)(M))** | The Debtors are seeking to sell the Assets free and clear of all Claims, and other interests, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code, except as to the Permitted Liens and the Assumed Liabilities. |
| **Credit Bid (Local Rule 6004-1(b)(iv)(N))** | Included in the Purchase Price is a credit bid pursuant to section 363(k) of the Bankruptcy Code of a portion of the First Lien Obligations in the amount of $20 million.<br><br><u>See</u> Stalking Horse Agreement § 2.5. |
| **Relief from Bankruptcy Rule 6004(h) (Local Rule 6004-1(b)(iv)(O))** | As of the Closing Date, the Sale Order: (i) shall have been entered by the Bankruptcy Court, and (ii) shall not have been appealed or be subject to any pending appeal, and no stay with respect thereto (including any stay under Bankruptcy Rule 6004(h) or 6006(d)) shall be in effect.<br><br><u>See</u> Stalking Horse Agreement, definition of "Sale Order." |

## THE PROPOSED SALE

27.     The Debtors believe that a prompt sale of the Assets represents the best option available under the circumstances, including in light of the Stalking Horse Bidder's available credit bid rights from the First Priority Obligations and DIP Facility Obligations. Moreover, it is critical for the Debtors to execute on any sale transaction as expeditiously as possible, as the Debtors are utilizing the Stalking Horse Bidder's cash collateral and obtaining debtor-in-possession financing to explore and facilitate this process. Time, therefore, is of the essence.

28.     By this Motion, the Debtors respectfully request that this Court approve the following general timeline, with the related request that the Bankruptcy Court enter an order granting this Motion on shortened notice.

(a)     ***Bid Deadline***: Bids for the Assets, including a marked-up form of the Stalking Horse Agreement, as well as the deposit and the other requirements for a bid to be considered a Qualified Bid (as defined in the Bid Procedures)

16

must be received by no later than **July 25, 2022 at 4:00 p.m. (prevailing Eastern Time)** or such later date as may be agreed to by the Debtors (the "Bid Deadline").

(b)    ***Sale Objection Deadline***: Objections to the Sale shall be filed and served no later than **July 25, 2022 at 4:00 p.m. (prevailing Eastern Time)**.[6]

(c)    ***Contract Cure Objection Deadline***: Objections to the potential assumption and assignment of any Contract, including proposed cure amounts, shall be filed and served no later than **July 25, 2022 at 4:00 p.m. (prevailing Eastern Time)** (the "Cure or Assignment Objection").

(d)    ***Auction***: The Auction, if necessary, shall be held **virtually** on July 28, 2022 **at 10:00 a.m. (prevailing Eastern Time)**, or such other location as identified by the Debtors after notice to all Qualified Bidders.

(e)    ***Residual Objections***.  Residual Objections to the Sale shall be filed and served no later than **August 1, 2022 at 4:00 p.m. (prevailing Eastern Time)**.

(f)    ***Sale Hearing***: Subject to this Court's availability and schedule, the Sale Hearing shall commence on or before **August [3], 2022 at __:__ _.m.**

29.    The Debtors believe that this timeline provides a reasonable prospect of receiving the highest and best offer under the circumstances without unduly prejudicing their estates, while ensuring that the Sale can close no later than August 15, 2022, as is contemplated under the Stalking Horse Agreement.

30.    Given the Debtors' extensive prepetition marketing efforts, the Debtors believe that the proposed timeline is sufficient to complete a fair, robust ,and open sale process that will maximize the value received for the Assets.  To further ensure that the Debtors' proposed Auction and Sale process maximizes value for the benefit of the Debtors' estates, and in accordance with the Stalking Horse Agreement, the Debtors and their professionals will use the time following the Petition Date to continue to actively market the Assets in an attempt to solicit the highest or best

---

[6]    This objection deadline applies to all objections to the Sale, with the exception of objections solely related to the identity of the Successful Bidder, adequate assurance of future performance by the Successful Bidder, and any changes to the form purchase agreement (the "Residual Objections").

bids available.  The Debtors believe the relief requested by this Motion is in the best interests of creditors, other stakeholders, and all other parties in interest, and should be approved.

31.     As part of its bid, the Stalking Horse Bidder negotiated for the timeline requested herein.  The Debtors believe that an expedited sale process will minimize any further deterioration of the Assets and is in the best interests of all stakeholders.  Thus, the Debtors have determined that pursuing the potential Sale in the manner and within the time periods prescribed in the Bid Procedures is in the best interest of the estates and will provide interested parties with sufficient opportunity to participate under the circumstances, including, without limitation, in light of the First Priority Obligations available for the Prepetition Secured Party to credit bid.

## THE BID PROCEDURES

**A.     The Bid Procedures**

32.     To optimally and expeditiously solicit, receive, and evaluate bids in a fair and accessible manner, the Debtors have developed and proposed the Bid Procedures, attached as **Exhibit 1** to the Bid Procedures Order.  The Bid Procedures were developed to permit an efficient (but sufficient) marketing and sale process, to promote participation and active bidding, and to ensure that the highest or best offer is received for the Assets.  As such, the Debtors believe the timeline for consummating the sale process established pursuant to the Bid Procedures is in the best interest of their estates and all parties in interest.

33.     The Bid Procedures describe, among other things, the requirements for prospective purchasers to participate in the bidding process, the availability and conduct of due diligence, the deadline for submitting a competing bid, the method and factors for determining qualifying bids, and the criteria for selecting a successful bidder.

34.     The following summary describes the salient points of the Bid Procedures and discloses certain information required pursuant to Local Rule 6004-1:[7]

| | |
|---|---|
| **Provisions Governing Qualifications of Bidders (Local Bankr. R. 6004-1(c)(i)(A))** | The Stalking Horse Bidder shall be deemed to be a Qualified Bidder and the Stalking Horse Agreement shall be deemed to be a Qualified Bid (the "Stalking Horse Bid"), without the need to comply with any of the requirements set forth below.<br><br>To receive due diligence information, including full access to the electronic data room and to additional non-public information, any party interested in submitting a bid, other than the Stalking Horse Bidder (each a "Potential Bidder"), must deliver the following documents (collectively, the "Preliminary Bid Documents") by email to the Debtors' investment banker, Houlihan Lokey Capital, Inc., Attn: Ryan Sandahl (email: rsandahl@hl.com), with a copy to the Debtors' counsel, Klehr Harrison Havey Branzburg, LLP, Attn: Domenic Pacitti (email: dpacitti@klehr.com) and Michael Rittinger (email: mrittinger@klehr.com) (collectively, the "Bid Recipients"):<br><br>(i)     a written disclosure of the identify of each entity that will be bidding for the Debtors' assets, is in control of such entity, or will otherwise be participating in connection with such bid;<br><br>(ii)    an "Acceptable Confidentiality Agreement," which shall mean a commercially reasonable confidentiality agreement in form and substance reasonable acceptable to the Debtors;<br><br>(iii)   sufficient evidence, as reasonably determined by the Debtors, to allow the Debtors to determine in their reasonable business judgment that (i) the Potential Bidder has the financial capacity to close a proposed transaction, which shall include financial statements of the Potential Bidder, including current audited and unaudited financial statements or other financial information of the Potential Bidder, or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, current audited and unaudited financial statements or other financial information of the Potential Bidder's equity holder or other financial backer, or such other form of financial disclosure and evidence acceptable to the Debtors and their advisors in their reasonable discretion taking into account the Debtors' fiduciary duties, demonstrating such Potential Bidder's ability to close the proposed transaction, to finance going concern operations to the extent contemplated, and to provide adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Potential Bidder; and (ii) intends to access the electronic data room |

---

[7]     This summary of the Bid Procedures is qualified in its entirety by the Bid Procedures attached as **Exhibit 1** to the Bid Procedures Order. All capitalized terms that are used in this summary, but not otherwise defined herein, shall have the meanings set forth in the Bid Procedures. To the extent there are any conflicts between this summary and the Bid Procedures, the terms of the Bid Procedures shall govern.

<table>
<tr><td></td><td>(described below) for a bona fide purpose consistent with the Bid Procedures.

Promptly after a Potential Bidder delivers the Preliminary Bid Documents to the Bid Recipients, the Debtors shall assess the adequacy of the evidence of its financial capacity and notify the Potential Bidder whether such Potential Bidder has submitted acceptable Preliminary Bid Documents so that the Potential Bidder may proceed to conduct due diligence and ultimately submit a Bid and participate in the Auction, as applicable.  Only those Potential Bidders that have submitted acceptable Preliminary Bid Documents (each, a "<u>Bidder</u>") may submit Bids.

As soon as reasonably practicable after the Debtors determine that a Potential Bidder is a Bidder, the Debtors shall provide such Bidder with access to an electronic data room and reasonable due diligence information as requested by such Bidder (to the extent such Bidder has not already been provided such access and information).  All due diligence requests must be directed to by email to the Debtors' investment banker, Houlihan Lokey Capital, Inc., Attn: Ryan Sandahl (email: rsandahl@hl.com), who will work to facilitate meetings between any interested Bidder and the Debtors' management team.  For all Potential Bidders (except for the Stalking Horse Bidder), the due diligence period will end on the Bid Deadline, and after the Bid Deadline, the Debtors will have no obligation to furnish any due diligence information.

The Debtors and their advisors shall coordinate all reasonable requests from Bidders for additional information and due diligence access.  The Debtors may decline to provide such information to Bidders who, in the Debtors' business judgment, have not established, or who have raised doubt, that such Bidder intends in good faith or has the capacity to consummate a sale transaction of all or substantially all of the Assets (a "<u>Transaction</u>").

For any Bidder who is a direct competitor of Seller or is affiliated with any direct competitor of Seller, the Debtors reserve the right to protect any diligence materials that the Debtors determine are business-sensitive and to utilize clean room or other similar methodologies in sharing to the extent such information becomes necessary for such party to submit a Qualified Bid.

Each Bidder shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated Transaction.

<u>See</u> Bid Procedures § B. 3.</td></tr>
<tr><td>**Good Faith Deposit (Local Rule 6004-1(b)(iv)(F))**</td><td>The Stalking Horse Bidder shall be deemed to be a Qualified Bidder at all times.  Likewise, the Stalking Horse Agreement shall at all times be deemed a Qualified Bid.  The Stalking Horse Bidder is not required to provide a deposit under the Stalking Horse Agreement.

Each Qualified Bid, other than the Stalking Horse Bid, must be accompanied by a cash deposit in the amount of ten percent (10%) of the proposed cash</td></tr>
</table>

20

| | |
|---|---|
| | portion of the Purchase Price to be held in an escrow account to be identified and established by the Debtors (the "Deposit").<br><br>See Bid Procedures § B. 3 (ix). |
| **Other Highlighted Terms Under Del. Bankr. L.R. 6004-1(b)(iv)** | Private Sale/No Competitive Bidding:  The Sale is being conducted pursuant to the competitive bidding process detailed in the Motion.<br><br>Credit Bid: The Stalking Horse Bidder shall automatically be deemed a Qualified Bidder and shall have the right to credit bid on a dollar-for-dollar basis all or a portion of (i) the First Priority Obligations; (ii) the DIP Facility Obligations, and (iii) the Break-Up Fee and Expense Reimbursement pursuant to section 363(k) of the Bankruptcy Code, provided that (iii) applies only if the Stalking Horse Bidder is credit bidding to out-bid another Qualified Bidder.<br><br>See Bid Procedures § B. 4.<br><br>Relief from Bankruptcy Rule 6004(h):  As noted in this Motion, the Debtors are requesting relief from the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d). |
| **Provisions Governing Qualified Bids (Local Bankr. R. 6004-1(c)(i)(A), (B))** | Each Potential Bidder must submit a bid that adheres to the following requirements (such a qualifying bid, a "Qualified Bid," and any person submitting such a bid, a "Qualified Bidder"):<br><br><table><tr><td>(i)</td><td>Stalking Horse Bidder.  The Stalking Horse Bidder shall be deemed to be a Qualified Bidder and the Stalking Horse Agreement shall be deemed to be a Qualified Bid, without the need to comply with any of the requirements set forth below.</td></tr><tr><td>(ii)</td><td>Submission of Qualified Bids.  All Qualified Bids must be submitted by email to the Debtors' investment banker, Houlihan Lokey Capital, Inc., Attn: Ryan Sandahl (email: rsandahl@hl.com), with a copy to the Debtors' counsel, Klehr Harrison Havey Branzburg, LLP, Attn: Domenic Pacitti (email: dpacitti@klehr.com) and Michael Rittinger (email: mrittinger@klehr.com) not later than **4:00 p.m. (prevailing Eastern Time) on July 25, 2022** (the "Bid Deadline").</td></tr><tr><td>(iii)</td><td>Form and Contents.  All Qualified Bids shall be in the form of an offer letter from a person or persons that the Debtors deem financially able to consummate the purchase of the Assets, which letter states and includes:</td></tr></table><br>    (A)   Marked Agreement. Each Qualified Bid must state the Qualified Bidder offers to purchase some or all of the Assets upon the terms and conditions set forth in an executed and attached complete asset purchase agreement prepared and executed by the Qualified Bidder (an electronic version in Word format and blacklined against the Stalking Horse Agreement), together with its exhibits and schedules, including |

terms relating to price and the time of closing (the "Proposed Agreement");

(B)     Purchase Price. Each Qualified Bid must clearly set forth the terms of any proposed Transaction, including and identifying separately any cash and non-cash components of the proposed Transaction consideration, such as certain liabilities to be assumed by the Bidder as part of the Transaction, for example (the "Purchase Price");

(C)     Committed Financing. To the extent that a Qualified Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the Transaction set forth in its Qualified Bid with cash on hand, each Qualified Bid must include evidence of committed financing that demonstrates that the Qualified Bidder has received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Qualified Bid. Such funding commitments or other financing acceptable to the Debtors must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have conditions acceptable to the Debtors;

(D)     Contingencies; No Financing or Diligence Outs. A Qualified Bid shall not be conditioned on a Qualified Bidder obtaining, or the sufficiency of, financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions;

(E)     Identity. Each Qualified Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Qualified Bid (including each equity holder or other financial backer of the Qualified Bidder if such Qualified Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Qualified Bid), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Qualified Bid. Each Qualified Bid must also include contact information for the specific person(s) and counsel the Debtors' advisors should contact regarding such Qualified Bid;

(F)     Authorization. Each Qualified Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its

Qualified Bid and the consummation of the Transactions contemplated in such Qualified Bid;

(G)    Substantial Contribution Waiver. Each Qualified Bid must contain an express waiver, effective upon submission of the Qualified Bid, of any substantial contribution claims by the Qualified Bidder;

(H)    Expenses; Disclaimer to Fees. Each Qualified Bid must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Potential Bidder (other than the Stalking Horse Bidder) shall be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, substantial contribution, or any other similar form of compensation, and by submitting a Bid any Potential Bidder is waiving any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code;

(I)    Consummation. Each Qualified Bid must include a statement that the Qualified Bidder is prepared to consummate the transaction, following entry of an order of this Court approving the Sale to the Successful Bidder (the "Sale Order");

(J)    Irrevocability. Each Qualified Bid must include a statement that, in the event the Qualified Bidder becomes the Successful Bidder or the Back-up Bidder (as defined below), such Qualified Bidder's offer is irrevocable until two (2) business days after the closing of the sale of the Assets;

(K)    Assumed Contracts and Leases. The Qualified Bid must state which (if any) of Seller's unexpired leases and executory contracts are to be assumed and assigned in connection with the consummation of the Qualified Bidder's bid;

(L)    Liquidated Damages. Each Qualified Bid must provide for liquidated damages in the event of the Qualified Bidder's breach of, or failure to perform under, the Proposed Agreement equal to the amount of the Deposit; and

(M)    Consent to Jurisdiction. Each Qualified Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to the Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bid Procedures, the Sale documents, and the closing of the sale, as applicable.

(iv)    Same or Better Terms. Each Qualified Bid shall be based on the Stalking Horse Bid and to the extent seeking to purchase

23

substantially all of the assets, must exceed the Stalking Horse Bid in relation to the Assets by the Minimum Overbid (as that term is defined in the Bid Procedures Order). Each Qualified Bid must be on terms that are not more burdensome than the terms of the Stalking Horse Bid, as determined by the Debtors, and considering, among other factors, the scope and manner of the proposed Transaction. Each Qualified Bid must include duly executed, non-contingent transaction documents necessary to effectuate the Sale and a copy of the Stalking Horse Agreement clearly marked to show all changes requested by the Potential Bidder, including those related to the respective Purchase Price and Assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such Bid.

(v) <u>Adequate Amounts</u>. All Qualified Bids must provide for adequate assurance of future performance to counterparties to any executory contracts and unexpired leases to be assumed by the Potential Bidder.

(vi) <u>As Is, Where Is</u>. The sale of the Assets shall be on an "as is, where is," and "with all defaults" basis and without representations or warranties of any kind, nature, or description by Seller, its agents or estate, except to the extent set forth in the Proposed Agreement of the Successful Bidder.

(vii) <u>Free and Clear</u>. Except as otherwise provided in the Proposed Agreement, all of Seller's right, title, and interest in and to the Assets to be acquired shall be sold free and clear of all liens, claims, charges, security interests, restrictions, and other encumbrances of any kind or nature thereon and there against (collectively, the "<u>Transferred Liens</u>"), with such Transferred Liens to attach to the proceeds of the sale.

(viii) <u>Good Faith Deposit</u>. Each Qualified Bid, other than the Stalking Horse Bid, must be accompanied by a cash deposit in the amount of ten percent (10%) of the proposed cash portion of the Purchase Price to be held in an escrow account to be identified and established by the Debtors (the "<u>Deposit</u>").

(ix) <u>Binding Effect</u>. By submitting its Qualified Bid, each Qualified Bidder is agreeing, and shall be deemed to have agreed, to abide by and honor the terms of the Bid Procedures and to refrain from submitting a Qualified Bid or seeking to reopen the Auction after conclusion of the Auction.

(x) <u>Designation of Qualified Bidders</u>.

(A) A Bid shall be considered a Qualified Bid and each Bidder that submits a Qualified Bid shall be considered a Qualified Bidder if the Debtors determine that such Bid meets the requirements of a Qualified Bid as set forth in the Bid Procedures.

<table>
<tr><td></td><td>(B)</td><td>Prior to the Auction, the Debtors shall notify each Qualified Bidder whether such party is a Qualified Bidder and shall provide the Notice Parties, as well as the Stalking Horse Bidder with a copy of each Qualified Bid.</td></tr>
<tr><td></td><td>(C)</td><td>Upon determination that any Bid is not a Qualified Bid, the Debtors shall notify such Bidder of such determination forthwith, but in any event not later than the commencement of the Auction.</td></tr>
<tr><td></td><td>(D)</td><td>Between the date that the Debtors notify a Bidder that it is a Qualified Bidder and the Auction date, the Debtors may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Without the prior written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase its Purchase Price, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bid Procedures; provided that any Qualified Bid may be improved at the Auction as set forth in the Bid Procedures. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in the Bid Procedures. The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times, and the Stalking Horse Agreement shall be a Qualified Bid. The Stalking Horse Bidder may increase the amount of its credit bid, up to the full amount of the First Priority Obligations and the DIP Facility Obligations at the Auction.</td></tr>
<tr><td></td><td>(E)</td><td>If any Bid is determined not to be a Qualified Bid, the Debtors shall refund such Bidder's Deposit promptly after the Bid Deadline.</td></tr>
<tr><td></td><td colspan="2">Bid Procedures, § B. 3.</td></tr>
<tr><td>Stalking Horse Bid Protections (Local Rule 6004-1(c)(i)(C))</td><td colspan="2">Break-Up/Topping. As set forth in the Stalking Horse Agreement and the Bid Procedures Order, the Debtors have agreed to pay, subject to this Court's approval, a break-up fee of $250,000.00 payable to the Stalking Horse Bidder in the event that the Stalking Horse Bidder is not selected as the Successful Bidder in accordance with the terms of the Bid Procedures (the "Break-Up Fee") and this Court authorizes the Debtors to enter into a purchase agreement documenting the same with a different Qualified Bidder.<br><br>Fees and Expense Reimbursement. As set forth in the Stalking Horse Agreement and the Bid Procedures Order, the Debtors have agreed to pay, subject to this Court's approval, expense reimbursement to the Stalking Horse Bidder if the Stalking Horse Bidder is not the Successful Bidder of up to $350,000.00, which amount is limited to legal fees and hard costs actually incurred by the Stalking Horse Bidder related to the Stalking Horse Agreement or the Sale (the "Expense Reimbursement").</td></tr>
</table>

10038374.v10

| | |
|---|---|
| | <u>See</u> Bid Procedures Introductory Paragraph<br><br><u>Minimum Overbid Protections</u>. Subject to this Court's approval, and as a condition of the Stalking Horse Bidder entering into the Stalking Horse Agreement, no offer for any of the Assets shall be accepted by the Debtors unless the proposed purchase price equals or exceeds the Purchase Price for the Assets by the sum of (the "<u>Minimum Overbid</u>"): (i) the Break-Up Fee (<u>**$250,000.00**</u>); <u>plus</u> (ii) the Expense Reimbursement (up to <u>**$350,000.00**</u>); plus (iii) <u>**$200,000.00**</u> (collectively, the "<u>Overbid Protections</u>") (as set forth in the Stalking Horse Agreement).<br><br><u>See</u> Bid Procedures § C. 3. |
| **Bidding Increments (Local Rule 6004-1(c)(i)(C)(3))** | Any Minimum Overbid after the Baseline Bid (as defined in the Bid Procedures) shall be made in increments of at least <u>**$200,000.00**</u> (the "<u>Minimum Overbid Increment</u>").  Additional consideration in excess of the amount set forth in the Baseline Bid may include cash and/or non-cash consideration; <u>provided</u>, <u>however,</u> that the value for such non-cash consideration shall be determined by the Debtors in their reasonable business judgment.<br><br><u>See</u> Bid Procedures § C. 3.<br><br>After each Overbid, the Debtors shall determine whether an Overbid is higher or otherwise better than the Baseline Bid (as defined in the Bid Procedures) in the initial Overbid round or, in subsequent rounds, the Overbid previously designated by the Debtors as the prevailing highest or best Bid (the "<u>Prevailing Highest Bid</u>").  The Debtors shall announce and describe to all Qualified Bidders present at the Auction the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid, as well as the value attributable by the Debtors to such Prevailing Highest Bid.<br><br>Any Overbid to a Prevailing Highest Bid by any party other than the Stalking Horse Bidder must provide more value than any prior bid after taking into account the Overbid Protections in each round of bidding.<br><br><u>See</u> Bid Procedures § C. 3. |
| **Modifications of Bidding and Auction Procedures (Local Rule 6004-1(c)(i)(D))** | The Debtors reserve the rights to modify the Bid Procedures or the requirements for determining a Qualified Bid to the extent that, after consultation with the Stalking Horse Bidder, the Debtors determine that such modification is mandated by acquittal of their fiduciary duties, provided that the Stalking Horse Bidder reserves all rights to oppose any such modification.  Notwithstanding the foregoing and subject in all respects to the Stalking Horse Agreement, the Debtors may not impair or modify the Stalking Horse Bidder's rights and obligations under the Stalking Horse Agreement or the Stalking Horse Bidder's right to credit bid at the Auction, including, without limitation any modification of the Bid Procedures that alter the Stalking Horse Bid's status as a Qualified Bid or the Stalking Horse Bidder's status as a Qualified Bidder. |

| | |
|---|---|
| | <u>See</u> Bid Procedures § G. |
| **Closing with Alternative Backup Bidders (Local Rule 6004-1(c)(i)(E))** | Prior to concluding the Auction, the Debtors shall: (i) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale; and (ii) using their reasonable discretion taking into account their fiduciary duties, identify and announce to all attending the Auction the highest or best offer or combination of offers for the Assets (the "<u>Successful Bid</u>") and any second-highest offer (the "<u>Back-up Bid</u>" and the Qualified Bidder submitting such Back-up Bid, the "<u>Back-up Bidder</u>") and the basis for such determination.  Any Potential Bidder submitting a Bid that otherwise constitutes a Qualified Bid is deemed, by the submission of such Qualified Bid, to consent to such Qualified Bid being treated by the Debtors as Back-up Bidder, provided that the Stalking Horse Bidder may in its sole discretion agree to serve or not serve as Back-Up Bidder.<br><br><u>See</u> Bid Procedures § C. 4. |
| **Provisions Governing the Auction (Local Rule 6004-1(c)(ii))** | (i)   <u>Time and Place</u>.  The Auction, if necessary, shall be held virtually on **July 28, 2022, at 10:00 a.m. (prevailing Eastern Time)**, or such other location as identified by the Debtors after notice to all Qualified Bidders.<br><br>(ii)   <u>Baseline Bid</u>. Prior to the commencement of the Auction, the Debtors shall determine which of the Qualified Bids, at such time, is the highest and best bid for purposes of constituting the opening bid of the Auction (the "<u>Baseline Bid</u>" and the Qualified Bidder submitting the Baseline Bid, the "<u>Baseline Bidder</u>"), and shall promptly notify the Stalking Horse Purchaser and all Qualified Bidders with Qualified Bids of the Baseline Bid.  The Baseline Bid may be composed of any combination of the Assets, and the Debtors may determine that different Baseline Bids exist for different groupings of the Assets.  The Debtors shall have the discretion to determine how to proceed when auctioning the Assets in groupings that do not include all of the Assets so as to maximize the value of the Assets.<br><br>(iii)   <u>Auction Procedures</u>.  The Auction shall be conducted in a timely fashion according to the following procedures:<br><br>(A)   The Debtors and their professional advisors shall direct, preside over, and transcribe the Auction.<br><br>(B)   At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid.   All incremental Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders.  The Debtors shall maintain a written transcript of all |

10038374.v10

Bids made and announced at the Auction, including the Baseline Bid, all Overbids, and the Successful Bid.

(C)     Only the Stalking Horse Bidder and any other Qualified Bidders with Qualified Bids (together, the "Auction Bidders") shall be entitled to make any subsequent bids at the Auction, subject to the terms of these Bid Procedures and other limitations as may reasonably be imposed by the Debtors.

(D)     The Auction Bidders shall appear virtually at the Auction, or through a duly authorized representative, who also may appear virtually at the Auction. Only the Debtors, counsel for the United States Trustee, professionals to the Committee, if appointed, the Auction Bidders, together with the professional advisors to each of the foregoing parties, may attend the Auction, also virtually.

(iv)    Reservation of Rights. The Debtors reserve the rights to modify the Bid Procedures or the requirements for determining a Qualified Bid to the extent that, after consultation with the Stalking Horse Bidder, the Debtors determine that such modification is mandated by acquittal of their fiduciary duties, provided that the Stalking Horse Bidder reserves all rights to oppose any such modification. Notwithstanding the foregoing and subject in all respects to the Stalking Horse Agreement, the Debtors may not impair or modify the Stalking Horse Bidder's rights and obligations under the Stalking Horse Agreement or the Stalking Horse Bidder's right to credit bid at the Auction, including, without limitation any modification of the Bid Procedures that alter the Stalking Horse Bid's status as a Qualified Bid or the Stalking Horse Bidder's status as a Qualified Bidder.

(v)     Bid Assessment. The Debtors, in consultation with the Committee, if any (or, if the Stalking Horse Purchaser has dropped out of the bidding, in consultation with the Committee and the DIP Facility Lender), may, in their reasonable discretion, (a) determine which Qualified Bid, if any, is the Prevailing Bid, and (b) reject at any time before entry of the Sale Order approving the Prevailing Bid, any Bid other than the Stalking Horse Bid that, in the reasonable discretion of the Debtors, in consultation with the Committee, if any, (or, if the Stalking Horse Purchaser has dropped out of the bidding, in consultation with the Committee and the DIP Facility Lender), is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Sale Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors; in each case (a)-(b), without limiting the rights of the DIP Facility Lender (in its capacity as such or as Stalking Horse Purchaser or Prepetition Secured Party) under the DIP Order, the Stalking Horse Agreement, any other document or applicable law. (collectively, the "Bid Assessment Criteria").

28

|  | (vi) | <u>Closing the Auction</u>.  The Auction shall continue until there is only one Qualified Bid that the Debtors determine, after taking into account the Bid Assessment Criteria, to be the highest or best Qualified Bid for the Assets.  Such Qualified Bid shall be declared the Successful Bid, and such Qualified Bidder, the Successful Bidder; the next highest and best Qualified Bid shall be declared the Back-Up Bidder (subject to the Stalking Horse Bidder's right not to serve as the Back-Up Bidder); and the Auction shall be closed.  Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid. |
|  | (vii) | <u>No Collusion; Good-Faith Bona Fide Offer</u>.  Each Qualified Bidder participating at the Auction shall be required to confirm on the record at the Auction that (i) it has not engaged in any collusion with respect to the bidding, (ii) its Qualified Bid is a good-faith bona fide offer, and (iii) it intends to consummate the proposed Transaction if selected as the Successful Bidder or the Back-Up Bidder. |
|  | Bid Procedures § C. 2. | |

35.     The Bid Procedures recognize the Debtors' fiduciary obligations to maximize the value of the assets and, as such, do not impair the Debtors' ability to consider all qualified bid proposals.  Additionally, as noted above, the Bid Procedures preserve the Debtors' rights to modify the Bid Procedures as necessary or appropriate to maximize value of the Debtors' estates.

**B.     The Auction and Sale**

36.     If one or more Qualified Bid is received by the Bid Deadline (other than the Stalking Horse Bid), the Debtors shall conduct an Auction to determine the highest and best Qualified Bid.  If no Qualified Bid (other than the Stalking Horse Bid) is received by the Bid Deadline, the Debtors shall deem the Stalking Horse Bid to be the Successful Bid without conducting the Auction.  The Debtors seek authority from this Court to schedule the Auction on a date as further described in the Bid Procedures.

**C.     Form and Manner of Sale Notice**

37.     On or within two (2) business days after entry of the Bid Procedures Order, the Debtors shall cause the Sale Notice to be served on: (a) the Office of the United States Trustee for

29

the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Joseph Cudia (joseph.cudia@usdoj.gov) and David L. Buchbinder (David.L.Buchbinder@usdoj.gov); (b) the holders of the thirty (30) largest, non-insider unsecured claims against the Debtors; (c) counsel to the Stalking Horse Bidder, the DIP Facility Lender and the Prepetition Secured Party; (d) any other parties with known secured claims against the Debtors or their counsel, if known; (e) all parties that have executed an NDA; (f) the United States Attorney's Offices for the District of Delaware and the Northern District of Illinois; (g) the Internal Revenue Service; (h) all state and local taxing authorities with an interest in the Assets; (i) the Attorneys General for the State of Delaware and the State of Illinois; (j) all other governmental agencies with an interest in the Sale and transactions proposed thereunder; (k) all other parties known or reasonably believed to have asserted an interest in the Assets; (l) the counterparties to the Assumed Contracts (the "Assumed Contract Counterparties"); (m) the Debtors' insurance carriers; (n) counsel to the Chicago and Midwest Regional Joint Board Affiliated with Workers United/SEIU (the "Union"); and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002.

### D.    Summary of the Assumption Procedures

38.    The Debtors are seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Assumed Contracts in connection with the Sale. Pursuant to the Bid Procedures Order, notice of the proposed assumption and assignment of the Assumed Contracts to the Successful Bidder, the proposed cure amounts related thereto, and the right, procedures, and deadlines for objecting thereto, shall be provided in separate notices, attached to the Bid Procedures Order as **Exhibit 3** (the "Cure and Possible Assumption and Assignment Notice") to be sent to the applicable Assumed Contract Counterparties.

10038374.v10

39.     Because the Bid Procedures Order sets forth the Assumption Procedures in detail, they are not restated herein.   Generally, however, the Assumption Procedures: (i) outline the process by which the Debtors shall serve notice to all Assumed Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right, and the procedures, to object thereto, and (ii) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Assumed Contracts to the extent necessary.

## BASIS FOR RELIEF

**A.     The Relief Sought in the Bid Procedures Order Is in the Best Interests of the Estates and Should Be Approved**

**1.     The Proposed Notice of the Bid Procedures and the Sale Process Is Appropriate**

40.     The Debtors seek authority to sell the Assets through an Auction and related sale process.  The Debtors and their advisors have conducted and will conduct an extensive marketing process.  The Debtors have a list of "Contact Parties" who will receive a copy of the "Information Package."  The list of Contact Parties shall encompass those parties who: (i) have executed NDAs with the Debtors, and (ii) whom the Debtors believe may be interested in pursuing a Sale, or whom the Debtors reasonably believe may have the financial resources to consummate such a transaction. The Bid Procedures are designed to elicit bids from one or more parties and to encourage a robust auction of the Assets, thus maximizing the value of the Debtors' estates for the benefit of their creditors and other stakeholders.

41.     Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify creditors of the proposed sale of the Assets, including a disclosure of the time and place of any auction, the terms and conditions of a sale, and the deadline for filing any objections.  The Debtors respectfully submit that the Sale Notice is reasonably calculated to provide all interested parties with timely

31

and proper notice of the proposed Sale, including: (i) the date, time, and place of the Auction (if one will be held), (ii) the Bid Procedures, (iii) the deadline for filing objections to the Sale and entry of the Sale Order, and the date, time, and place of the Sale Hearing, (iv) a reasonably specific identification of the Assets, (v) a description of the Sale as being free and clear of liens, claims, encumbrances, and other interests other than the Assumed Liabilities (as such terms are defined in the Stalking Horse Agreement), with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the Sale proceeds, and (vi) notice of the proposed assumption and assignment of the Assumed Contracts to the Successful Bidder.

42.     The Debtors further submit that notice of this Motion and the related hearing to consider entry of the Bid Procedures Order, coupled with service of the Sale Notice, and the Cure and Possible Assumption and Assignment Notice, as provided for herein, constitutes good and adequate notice of the Sale and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002.  The Debtors further submit the proposed notice procedures are designed to maximize the chance of obtaining the broadest possible participation in the Debtors' marketing process, while minimizing costs to the estates. Accordingly, the Debtors respectfully request the Court find the proposed notice procedures set forth in this Motion are sufficient, and no other or further notice of the Bid Procedures, Auction, Sale, or Sale Hearing is required.

### 2.     The Bid Procedures Are Appropriate and Will Maximize Value

43.     Bid procedures should be approved when they provide a benefit to the debtor's estate by maximizing the value of the debtor's assets.  See In re Edwards, 228 B.R. 552, 361 (Bankr. E.D. Pa. 1998) ("The purpose of procedural bidding orders is to facilitate an open and fair public sale designed to maximize value for the estate.").  Courts have made clear that a debtor's

32

business judgment is entitled to deference with respect to the procedures to be used in selling an estate's assets.  See, e.g., In re Schipper, 933 F.2d 513, 515 (7th Cir. 1991) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification'") (internal citations omitted)); In re Martin, 91 F.3d 389, 395 (3d Cir. 1996) (quoting Schipper); In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999) (same); see also In re Integrated Resources, Inc., 147 B.R. 650, 656-57 (S.D.N.Y. 1992) (bid procedures that have been negotiated by a trustee are to be reviewed in accordance with the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid").

44.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  See Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3d Cir. 2004); Official Comm. of Unsecured Creditors of Cybergenics, Corp. v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003); see also In re Food Barn Stores, Inc., 101 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); Integrated Resources, 147 B.R. at 659 ("[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the trustee's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (internal citations omitted); Edwards, 228 B.R. at 561.

45.    To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, appropriate in the context of bankruptcy transactions.  See, e.g., In re O'Brien Envtl. Energy, Inc., 181 F.3d 527, 537 (3d Cir. 1999); Integrated Resources, 147 B.R. at 659 (bid procedures "are important tools to encourage bidding and to maximize the value of the debtor's assets"); In re Fin. News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("court-imposed rules for the

33

disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should]

provide for a fair and efficient resolution of bankrupt estates").

46.    The Debtors believe the proposed Bid Procedures will establish the parameters

under which the value of the Sale may be tested at the Auction.  The Bid Procedures will increase

the likelihood the Debtors will receive the greatest possible consideration because they will ensure

a competitive and fair bidding process.  The Debtors believe that the proposed Bid Procedures will

promote active bidding (taking into account the Prepetition Secured Party's credit bid rights) from

seriously interested parties and will elicit the highest or best offers available for the Assets.  The

proposed Bid Procedures will enable the Debtors to conduct the Sale in a controlled, fair, and open

fashion that will encourage participation by financially capable bidders who will offer the best

package for the Assets and who can demonstrate the ability to close the transaction.

47.    Specifically, the proposed Bid Procedures contemplate an open auction process

with minimum barriers to entry and provide potential bidding parties with sufficient time to

perform due diligence and acquire the information necessary to submit a timely and well-informed

bid.  At the same time, the proposed Bid Procedures provide the Debtors with a robust opportunity

to consider competing bids and select the highest or best offer for the completion of the Sale.

Additionally, entering into the Stalking Horse Agreement with the Stalking Horse Bidder ensures

the Debtors obtain fair market value by making a minimum purchase price for the Assets that will

be tested in the marketplace.  As such, creditors can be assured the consideration obtained will be

fair and reasonable and at or above the market.

48.    Accordingly, proposed Bid Procedures and associated Sale process timeline will

provide the Debtors with ample time to complete their extensive and robust marketing process,

10038374.v10

while ensuring that the Debtors are not unnecessarily continuing to incur costs associated with preserving the value of the Assets pending consummation of a Sale.

49.    Similar bidding procedures and sale timelines have been approved by other courts in this district.  See, e.g., In re Armstrong Flooring, Inc., Case No. 22-10426 (Bankr. D. Del. May 31, 2022), ECF No. 233 (approving bid procedures 17 days after filing of motion and setting first bid deadline 14 days after entry of bid procedures order); In re Lucky Brand Dungarees, LLC, No. 20-11768 (CSS) (Bankr. D. Del. July 30, 2020), ECF No. 251 (approving bidding procedures, with designated stalking horse bid protections, including bid deadline 8 days after entry of bidding procedures order and sale hearing 40 days after the petition date); In re Templar Energy LLC, No. 20-11441 (BLS) (Bankr. D. Del. June 23, 2020), ECF No. 101 (approving bidding procedures with bid deadline 13 days after entry of bidding procedures order and sale hearing 43 days after the petition date); In re CIBER, Inc., Case No. 17-10772 (BLS) (Bankr. D. Del. May 2, 2017), ECF No. 150 (bid procedures order providing for a sale hearing date approximately 40 days following the petition date); see also In re Transformation Tech Inv'rs, Inc., No. 20-12970 (MFW) (Bankr. D. Del. Dec. 2, 2020) (approving bidding procedures providing for 35 days between petition date and bid deadline); In re John Varvatos Enters., Inc., No. 20-11043 (MFW) (Bankr. D. Del. June 9, 2020) (approving bidding procedures providing for 38 days between petition date and bid deadline); The News-Gazette, Inc., No. 19- 11901 (KBO) (Bankr. D. Del. Sept. 18, 2019) (approving bidding procedures providing for 27 days between petition date and bid deadline).

50.    Thus, the Bid Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances because the Bid Procedures are designed to maximize the value to be received by the Debtors' estates.

### 3.    The Minimum Overbid Increment Is Appropriate

Case 22-10559-JKS    Doc 17    Filed 06/22/22    Page 36 of 57

51.     One important component of the proposed Bid Procedures is the "Overbid" provision.  Once the Debtors determine the Baseline Bid, which shall equal or exceed the value of the Purchase Price under the Stalking Horse Agreement, as determined by the Debtors, plus the Initial Overbid, and hold the Auction, bidding on the Assets must be in Minimum Overbid Increments of at least **$200,000.00.**  The Debtors believe that such Minimum Overbid Increment is reasonable under the circumstances (including in light of the available credit bid of the Prepetition Secured Party) and will enable the Debtors to maximize the value received for the Assets while limiting any potential chilling effect in the marketing process.

### 4.      Entering into the Stalking Horse Agreement with Bid Protections Has a Sound Business Purpose and Should Be Approved

52.     Pursuant to the Motion, the Debtors are seeking the approval of this Court of the Stalking Horse Bidder and to offer the Bid Protections.  The Debtors believe that, in this case, such relief is warranted to ensure the Debtors' ability to take advantage of a potentially value-maximizing bid.  The ability of the Debtors to offer the Stalking Horse Bidder the Bid Protections is beneficial to the Debtors' estates and creditors in that, by providing these incentives, the Debtors will have an opportunity to induce a Potential Bidder to submit or increase its bid prior to the Auction.

53.     The United States Court of Appeals for the Third Circuit has established standards for reviewing bid protections in a bankruptcy case.  See In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533–38 (3d Cir. 1999); see also Reliant Energy Channelview LP v. Kelson Channelview LLC (In re Reliant Energy Channelview LP), 594 F.3d 200, 206 (3d Cir. 2010).  The Court has held that the administrative expense provisions of § 503(b) of the Bankruptcy Code govern in the bankruptcy context.  See In re Reliant Energy, 594 F.3d at 206 (finding that there is no "compelling justification for treating an application for a break-

36

up fee and expenses under § 503(b) differently from other applications for administrative expenses under the same provision." (citing In re O'Brien, 181 F.3d at 535)).  Accordingly, protections must provide some postpetition benefit to the estate.  See In re Energy Future Holdings Corp., 904 F.3d 298, 314 (3rd Cir. 2018), In re O'Brien, 181 F.3d at 533.  For example, "such a benefit could be found if assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited" or by "serv[ing] as a catalyst to higher bids."  In re O'Brien, 181 F.3d at 537.  Break-up fees may also benefit the estate by "induc[ing] a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely," thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  Id.  Finally, a break-up fee may benefit the estate if it induces a bidder to remain committed to its purchase after an auction is ordered.  In re Reliant Energy, 594 F.3d at 207-08; see also In re Energy Future Holdings, 904 F.3d at 314.

54.    The Stalking Horse Bidder has expended, and will continue to expend, time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale, and its bid will be subject not only to Court approval, but also to overbidding by third parties.  The Bid Protections granted to the Stalking Horse Bidder were negotiated in good faith and at arm's length.  Thus, the Bid Protections are actual and necessary to preserve the value of the estates.  The Debtors agreed to the Bid Protections in the Stalking Horse Agreement because they ensure the Debtors will have the benefit of the option to accept the transaction with the Stalking Horse offered through the Stalking Horse Agreement, without sacrificing the potential for interested parties to submit overbids at the Auction.

10038374.v10

55.     Furthermore, the proposed Break-Up Fee of **$250,000.00** and the Expense Reimbursement capped at **$350,000.00** are well within the range of similar fees approved by courts in this District.  See, e.g., Region, LLC, Case No. 21-11238 (CTG) (Bankr. D. Del. Oct. 14, 2021) [D.I. 103] (approving a break-up fee of 3% of the purchase price); In re Sequential Brands Grp., Inc., et al., Case No. 21-11194 (JTD) (Bankr. D. Del. Sept. 24, 2021) [D.I. 138] (approving a break-up fee of 3.65% of the purchase price); In re Knotel, Inc., et al., Case No. 21-10146 (MFW) (Bankr. D. Del. Case 22-10367 Mar. 11, 2021) [D.I. 418] (approving a break-up fee of 3% of the purchase price); In re Ursa Piceance Holdings LLC, et al., Case No. 20-12065 (BLS) (Bankr. D. Del. Sept. 29, 2020) [D.I. 124] (authorizing a break-up fee in an amount not to exceed 2.5% of the purchase price); In re Brooks Brothers Grp., Inc. et al., Case No. 20-11785 (CSS) (Bankr. D. Del. Aug. 3, 2020) [D.I. 285] (approving a break-up fee of 3% of the purchase price); In re Southland Royalty Co. LLC, Case No. 20-10158 (KBO) (Bankr. D. Del. Apr. 29, 2020) [D.I. 377] (authorizing a break-up fee in an amount not to exceed 3% of the purchase price); In re Earth Fare, Inc., et al., Case No. 20- 10256 (KBO) (Bankr. D. Del. Feb. 14, 2020) [D.I. 122] (authorizing a break-up fee in an amount not to exceed 3% of the purchase price); In re Celadon Grp., Inc., Case No. 19–12606 (KBO) (Bankr. D. Del. Jan. 6, 2020) [D.I. 219] (authorizing a break-up fee of up to 3% of the purchase price); In re Bumblebee Parent Inc., et al., Case No. 19-12502 (LSS) (Bankr. D. Del. Dec. 19, 2019) (approving a break-up fee of approximately 2.5% of the purchase price) [D.I. 171]; In re Things Remembered, Inc., et al., Case No. 19-10234 (KG) (approving a break-up fee of 2.4% of the purchase price) [D.I. 150].[8]

---

[8]     The referenced orders are voluminous in nature and, therefore, are not attached to this Motion; however, in accordance with Local Rule 7007-2(a)(vii), the Debtors' proposed counsel has copies of each order and will make them available to this Court or to any party that requests them.  Additionally, the orders are available on this Court's CM/ECF PACER site at the cited docket numbers and on the dates specified above.

**5.      The Proposed Notice Procedures for the Assumed Contracts and the Identification of Related Cure Amounts Are Appropriate**

56.      As set forth above, the Sale contemplates the potential assumption and assignment of the Assumed Contracts to the Successful Bidder arising from the Auction, if any.  In connection with this process, the Debtors believe it is necessary to establish a process by which: (i) the Debtors and the Assumed Contract Counterparties can reconcile cure obligations, if any, in accordance with sections 105(a) and 365 of the Bankruptcy Code, and (ii) such counterparties can object to the potential assumption and assignment of the Assumed Contracts and/or related cure amounts.

57.      The Bid Procedures specify the process by which the Debtors will serve Cure and Possible Assumption and Assignment Notices and the procedures and deadline for Assumed Contract Counterparties to Assumed Contracts to file and serve Cure or Assignment Objections.

58.      Except as may otherwise be agreed to in the Successful Bid or by the parties to an Assumed Contract, at the closing of the Sale, the Successful Bidder shall cure those defaults under the Assumed Contracts that need to be cured in accordance with section 365(b) of the Bankruptcy Code, by (i) payment of the undisputed cure amount (the "Cure Amount") and/or (ii) reserving amounts with respect to any disputed cure amounts.

59.      As set forth in the Bid Procedures Order, the Debtors also request any party that fails to object to the proposed assumption and assignment of any Assumed Contract be deemed to consent to the assumption and assignment of the applicable Assumed Contract pursuant to section 365 of the Bankruptcy Code on the terms set forth in the Sale Order, along with the Cure Amounts identified in the Cure and Possible Assumption and Assignment Notice.

60.      The Debtors believe that the Assumption Procedures are fair and reasonable, provide sufficient notice to the Assumed Contract Counterparties of the potential assumption and assignment of its Assumed Contracts, and provide certainty to all parties in interest regarding their

obligations and rights with respect thereof.  Accordingly, the Debtors request this Court approve the Assumption Procedures set forth in the Bid Procedures Order.

**B.      Approval of the Proposed Sale Is Appropriate and in the Best Interests of the Estates**

**1.      The Sale of the Assets Should Be Authorized Pursuant to Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtors' Business Judgment**

61.      Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A sale of the debtor's assets should be authorized pursuant to § 363 if a "sound business purpose" exists for the proposed transaction.  See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) ("Under Section 363, the debtor-in-possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); In re ICL Holding Co. Inc., 802 F.3d 547, 551 (3d Cir. 2015); Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (approving a sale pursuant to section 363 where there was a "legitimate business justification").

62.      Courts typically consider the following factors in determining whether a proposed sale satisfies this standard: (i) whether a sound business justification exists for the sale, (ii) whether adequate and reasonable notice of the sale was given to interested parties, (iii) whether the sale will produce a fair and reasonable price for the property, and (iv) whether the parties have acted in good faith.  See Del. & Hudson, 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).  A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estates, creditors, or interest holders.  See, e.g., In re Abbotts Dairies of Pa, Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983).  "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily

40

or capriciously), courts will generally not entertain objections to the debtor's conduct." <u>Comm. of</u>

<u>Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)</u>,

60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

63.      The Debtors have a sound business justification for selling the Assets.  First, the

Debtors believe the Sale will maximize the Assets' going-concern value by allowing a party to bid

on business assets that would have substantially less value on a stand-alone or liquidation basis.

Moreover, to the extent the Successful Bidder assumes certain of the Assumed Contracts and the

Assumed Liabilities, it will result in payment in full for virtually all of the Debtors' trade creditors.

Second, the sale of the Assets will be subject to competing bids, enhancing the Debtors' ability to

receive the highest or otherwise best value for the Assets.  The value of the Assets will be tested

through the Auction conducted pursuant to and according to the Bid Procedures.  Ultimately, the

Successful Bid, after being subject to a "market check" in the form of the Auction and accepted

by the Debtors in the exercise of their reasonable business judgment, will constitute the highest

and best offer for the Assets and at this time the Debtors believe will provide a greater recovery

for their estates than any known or practically available alternative.  <u>See, e.g.</u>, <u>In re Trans World</u>

<u>Airlines, Inc.</u>, No. 01-00056, 2001 WL 1820326, at *4 (Bankr. D. Del. 2001) (while a "section

363(b) sale transaction does not require an auction procedure . . . the auction procedure has

developed over the years as an effective means for producing an arm's-length fair value

transaction").  Consequently, the fairness and reasonableness of the consideration to be paid by

the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open

and fair auction process—the best means for establishing whether a fair and reasonable price is

being paid.

64.     Thus, absent a change in circumstances that causes the Debtors to abandon the sale process, the Debtors submit the Successful Bidder's purchase agreement will constitute the highest or otherwise best offer for the Assets and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  As such, the Debtors' determination to explore selling the Assets through an Auction process and subsequently to enter into the asset purchase agreement with the Successful Bidder (to the extent the Successful Bidder is someone other than the Stalking Horse Bidder) will be a valid and sound exercise of the Debtors' business judgment.  The Debtors will submit evidence at the Sale Hearing to support these conclusions. Therefore, the Debtors request the Court make a finding the proposed sale of the Assets is a proper exercise of the Debtors' business judgment and is rightly authorized.

### 2.     Sale Provisions Highlighted Pursuant to Local Rule 6004-1(b)(iv)[9]

65.     The following discloses certain information required to be highlighted in any sale motion pursuant to Local Rule 6004-1:

| | |
|---|---|
| **Release of Claims (Local Rule 6004-1(b)(iv)(C))** | The Sale Order will provide that certain claims against the Debtors and/or the Purchaser are barred or otherwise waived. |
| **Closing and Other Deadlines (Local Rule 6004(b)(iv)(E))** | As set forth above, the Debtors are subject to certain deadlines, including that (a) the Bid Procedures Order must be entered on or prior to fifteen (15) days after the Petition Date; (b) the Sale Order must be entered on or prior to forty-five (45) days after the Petition Date; and (c) the Sale must close on or prior to August 15, 2022. |
| **Record Retention (Local Rule 6004-1(b)(iv)(J))** | The proposed Sale Order will provide that the Debtors shall have reasonable access to their books and records after Closing. |
| **Successor Liability (Local Rule 6004-1(b)(iv)(L))** | The proposed Sale Order will provide that the Purchaser shall not have any successor liability related to the Debtors or the Assets. |
| **Credit Bidding (Local Rule 6004-1(b)(iv)(N))** | The Bid Procedures allow the Stalking Horse Bidder, in its capacity as the DIP Facility Lender, to credit bid its DIP Facility Obligations, and in its capacity as the Prepetition Secured Party, to credit bid a portion (or all, as it so chooses) of |

---

[9]     If a provision of Local Rule 6004-1(b)(iv) is not discussed in this section, it means that the provisions governing the sale of the Assets do not contain a provision that triggers disclosure under that rule.

| | |
|---|---|
| | the First Priority Obligations, each as set forth in the Stalking Horse Agreement, in addition to its Break-Up Fee and Expense Reimbursement (provided that the Stalking Horse Bidder is credit bidding to out-bid another Qualified Bidder) pursuant to the Stalking Horse Agreement |
| **Relief from Bankruptcy Rule 6004(h) (Local Rule 6004-1(b)(iv)(O))** | As explained in further detail below, to maximize the value received for the Assets, the Debtors seek to close the transaction as soon as possible after the Sale Hearing.  Accordingly, the Debtors have requested the Court waive the 14-day stay period under Bankruptcy Rules 6004(h) and 6006(d). |

### 3.    Adequate and Reasonable Notice of the Sale Will Be Provided

66.    As described above, the Sale Notice will: (i) be served in a manner that provides at least 21-days' notice of the date, time, and location of the Sale Hearing following entry of the Bid Procedures Order, (ii) inform parties in interest of the deadlines for objecting to the Sale or the assumption and assignment of the Assumed Contract, and (iii) otherwise include all information relevant to parties interested in or affected by the Sale.  Significantly, the form and manner of the Sale Notice will have been approved by this Court pursuant to the Bid Procedures Order, after notice and a hearing, before it is served on parties in interest.

### 4.    The Sale and Purchase Price Will Reflect a Fair-Value Transaction

67.    It is well settled that, where there is a court-approved auction process, a full and fair price is presumed to have been obtained for the assets sold, as the best way to determine value is exposure to the market.  See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434, 457 (1999).  The Debtors will continue to market the Assets and solicit offers consistent with the Bid Procedures and Stalking Horse Agreement, including, without limitation, by providing acceptable Bidders, with executed NDAs, with access to the data room and requested information.  In this way, the number of Bidders that are eligible to participate in the competitive Auction process will be maximized.  On the other hand, if no Auction is held because no Auction

43

is necessary, the Stalking Horse Agreement's purchase price conclusively will have been demonstrated to be fair value.

   **5.    The Sale of the Assets Should Be Free and Clear of Interests Pursuant to Section 363(f) of the Bankruptcy Code**

68.    The Debtors submit it is appropriate to sell the Assets free and clear of all liens, claims, encumbrances, and other interests (collectively, the "<u>Interests</u>") other than the Assumed Liabilities (as such term is defined in the Stalking Horse Agreement) pursuant to section 363(f) of the Bankruptcy Code, with any such Claims and Interests attaching to the net sale proceeds of the Assets, as and to the extent applicable.

69.    Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (i) applicable nonbankruptcy law permits such a free and clear sale, (ii) the holder of the interest consents,[10] (iii) the interest is a lien and the sale price of the property exceeds the value of all liens on the property, (iv) the interest is the subject of a bona fide dispute, or (v) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  <u>See</u> 11 U.S.C. § 363(f).  Section 363(f) of the Bankruptcy Code is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to permit the Debtors' sale of the Assets free and clear of all interests (<u>i.e.</u>, all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed liabilities under the applicable purchase agreement.  <u>See</u> <u>In re Kellstrom Indus., Inc.</u>, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

---

[10]    Pursuant to that certain Intercreditor Agreement dated as of September 25, 2019, the second lienholder, Parallel49 Equity (Fund V), Limited Partnership, is deemed to have consented pursuant to section 363(f) of the Bankruptcy Code upon the consent of the Prepetition Secured Party.

70.    The Debtors will send the Sale Notice to, among others, all parties who assert liens or claims against the Assets.  Any holder of a claim against or interest in the Assets who does not object to the applicable Transaction will be deemed to have consented to the sale of the Assets free and clear.  See 11 U.S.C. 363(f)(2); see Hargrave v. Twp. of Pemberton, 175 B.R. 855, 858 (Bankr. D.N.J. 1994).  Moreover, the Debtors believe that any parties that do object on the basis that they hold liens or claims against the Assets will either: (a) be holders of liens or claims that are subject to a bona fide dispute, or (b) would be compelled to accept cash in satisfaction of their interests. Cf. 11 U.S.C. §§ 363(f)(3) & 363(f)(5).  Any lienholder also will be adequately protected by having its liens, if any, attach to any proceeds of the applicable Transaction, in the same order of priority, with the same validity, force, and effect, that such creditor had prior to the sale, subject to any claims and defenses that the Debtors and their estates may possess with respect thereto.  Cf. id. § 363(f)(3).  Therefore, pursuant to section 363 of the Bankruptcy Code, the Debtors may sell the Assets free and clear of all liens, claims, and encumbrances.

**6.    The Assets and the Assumed Contracts Should Be Sold Free and Clear of Successor Liability.**

71.    The Sale Order provides the Successful Bidder shall not have any successor liability related to the Debtors or the Assets to the maximum extent permitted by law.  Extensive case law establishes that claims against a winning bidder may be directed to the proceeds of a free and clear sale of property and may not subsequently be asserted against that buyer.

72.    Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. Courts, however, have consistently held a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims.  See Amphenol Corp. v. Shandler (In re Insilco Techs., Inc.), 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a § 363

45

sale permits a buyer to take ownership of property without concern that a creditor will file suit

based on a successor liability theory); The Ninth Avenue Remedial Group v. Allis-Chalmers Corp.,

195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating a bankruptcy court has the power to sell assets

free and clear of any interest that could be brought against the bankruptcy estate during the

bankruptcy); see also In re Chrysler LLC, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[I]n

personam claims, including any potential state successor or transferee liability claims against New

Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore

extinguished by the Sale.").

73.     The purpose and value of an order authorizing the transfer of the Assets would be

frustrated if claimants thereafter could use the transfer as a basis to assert claims against the

Successful Bidder.  Under section 363(f) of the Bankruptcy Code, the Successful Bidder is entitled

to know the Assets are not tainted by latent claims that could be asserted against the Successful

Bidder after the proposed transaction is completed.  Absent that ruling, the value of the Assets

could be severely compromised.  Accordingly, consistent with the above-cited case law and

provisions of the Bankruptcy Code, the order approving the sale of the Assets should state the

Successful Bidder is not liable as a successor under any theory of successor liability, for Interests

that encumber or relate to the Assets.

> **7.    The Sale Has Been Proposed in Good Faith and Without Collusion, and the Successful Bidder Will Be a "Good-Faith Purchaser" Entitled to the Full Protection of Bankruptcy Code § 363(m); and the Sale of the Assets Does Not Violate Bankruptcy Code § 363(n)**

74.     The Debtors request that the Court find the Successful Bidder is entitled to the

benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with

the sale of the Assets.

75.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

76.    Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to § 363 from the risk it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such purchaser purchased or leased the assets in "good faith."  Although the Bankruptcy Code does not define "good faith," courts have held a purchaser shows its good faith through the integrity of its conduct during the course of the sale proceedings, finding that, where there is a lack of such integrity, a good-faith finding may not be made.  See, e.g., Abbotts Dairies of Pa., 788 F.2d at 147 ("Typically, the misconduct that would destroy a [buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer] and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); In the Matter of Andy Frain Servs., Inc., 798 F.2d 1113 (7th Cir. 1986) (same); In re Sasson Jeans, Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

77.    The Debtors submit the Stalking Horse Bidder, or any other Successful Bidder arising from the Auction, would be a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code, and the resulting purchase agreement would be a good-faith agreement on arm's-length terms entitled to the protections of section 363(m) of the Bankruptcy Code.[11] First, as set forth in more detail above, the consideration to be received by the Debtors pursuant to

---

[11]    The Debtors believe a finding of good faith within the meaning of § 363(m) will be appropriate for the Successful Bidder arising from the Auction and the Bid Procedures.  Pursuant to the Bid Procedures, any Successful Bidder will have had to present a proposal in accordance with the Bid Procedures.  In addition, the Debtors will not choose as the Successful Bidder or the Backup Bidder any entity whose good faith under § 363(m) can reasonably be doubted and will be prepared to present the Court with sufficient evidence to allow the Court to find that the "good faith" standard of §363(m) has been satisfied.

the Sale will be subject to a market process by virtue of Debtors' marketing efforts and the Auction and will be substantial, fair, and reasonable.  Second, the asset purchase agreement entered into by the Debtors and the Successful Bidder will be the result of extensive arm's-length negotiations, during which all parties will have the opportunity to be, and the Debtors will be, represented by competent counsel, and any purchase agreement with a Successful Bidder will be the culmination of the Debtors' competitive market process and, if necessary, the Auction, in which all negotiations will be conducted on an arm's-length, good-faith basis.  Third, where—as the Debtors anticipate will be the case here—there is no indication of any "fraud or collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" or similar conduct, there is no cause that would permit the Sale to be avoided pursuant to § 363(n). Moreover, with respect to potential bidders, the Bid Procedures are designed to ensure no party is able to exert undue influence over the process.  Finally, the Successful Bidder's offer will be evaluated and approved by the Debtors in consultation with their advisors.  Accordingly, the Debtors believe the Successful Bidder and the resulting purchase agreement should be entitled to the full protections of section 363(m) of the Bankruptcy Code.

78.     Moreover, because there will be no fraud or improper dealing of any kind, the Sale does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code, and, as a result, the Purchaser should receive the protections afforded good faith purchasers by section 363(m) of the Bankruptcy Code.  Accordingly, the Debtors request the Court make a finding at the Sale Hearing that the agreement reached with the Successful Bidder was at arm's length and is entitled to the full protections of section 363(m) of the Bankruptcy Code.  The Debtors will submit evidence at the Sale Hearing to support these conclusions.

**8.     Credit Bidding Should Be Authorized Pursuant to Section 363(k) of the Bankruptcy Code**

48

79.    A secured creditor is allowed to "credit bid" the amount of its claims in a sale of assets in which it has a security interest.  Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) of the Bankruptcy Code allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the creditor's economic value.  See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.), 432 F.3d 448, 459-60 (3d Cir. 2006) ("It is well settled among district and bankruptcy courts that creditors can bid the full-face value of their secured claims under § 363(k)").

80.    In this District, absent cause for restriction on credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim.  See In re Source Home Entm't, LLC, No. 14-115533 (KG) (Bankr. D. Del. July 21, 2014) (order approving Bid Procedures which authorized parties with secured claims to credit bid); In re PTC Alliance Corp., No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) (order authorizing, but not directing, the administrative agent to credit bid); In re Hayes Lemmerz Int'l, Inc., No. 09-11655 (Bankr. D. Del. Sept. 22, 2009) (order authorizing interested party to exercise its right under Bankruptcy Code § 363(k) to make a credit bid); In re Foamex Int'l Inc., 09-10560, (Bankr. D. Del. May 27, 2009) (order authorizing the sale of substantially all of the debtor's assets in a $155 million credit bid over a $151.5 million all-cash bid); see also Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.), 432 F.3d 448, 459-60 (3d Cir. 2006) (citations omitted).

49

81.    Thus, pursuant to section 363(k) of the Bankruptcy Code and subject to the Bid Procedures, the Stalking Horse Bidder, in its capacity as the Prepetition Secured Party and the DIP Facility Lender, should be allowed to submit a Credit Bid as set forth in the Stalking Horse Agreement at an Auction, which also contemplates a Credit Bid for the Bid Protections.

**C.    The Assumption and Assignment of the Assumed Contracts Should Be Approved**

### 1.    The Assumption and Assignment of the Assumed Contracts Reflects the Debtors' Reasonable Business Judgment

82.    To facilitate and effectuate the sale of the Assets, the Debtors are seeking authority to assign the Assumed Contracts to the Successful Bidder to the extent required by such Successful Bidder.

83.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided the defaults under such contracts and leases are cured and adequate assurance of future performance is provided.  See 11 U.S.C. § 365(b)(1).  The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate.  See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989); see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).  Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract.  See In re Decora Indus., Inc., 2002 WL 32332749, at *8 (D. Del. 2002); Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp), 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of

50

a decision to reject an executory contract is governed by the business judgment standard"). A debtor's decision to assume or reject an executory contract or expired lease will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. See Sharon Steel, 872 F.2d at 40 (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code"); Network Access Solutions, 330 B.R. at 75; Exide Techs., 340 B.R. at 239.

84.    Here, the Court should approve the decision to assume and assign the Assumed Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment. First, the Assumed Contracts are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets. Second, it is unlikely any purchaser would want to acquire the Assets unless a significant number of the contracts needed to manage the day-to-day operations were included in the transaction. Third, the Assumed Contracts will be assumed and assigned as part of a process approved by the Court pursuant to the Bid Procedures Order and, thus, will be reviewed by key constituents in these Chapter 11 Cases. Accordingly, the Debtors submit the assumption and assignment of the Assumed Contracts, if required by the Successful Bidder, should be approved as a sound exercise of the Debtors' business judgment.

85.    A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement. See 11 U.S.C. § 365(f)(2). Significantly, among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating adequate assurance of future performance is

51

present when the prospective assignee of a lease from the debtor has financial resources and has expressed willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng' g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d Cir. 1993); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

86.     Counterparties to Assumed Contracts will have the opportunity to object to adequate assurance of future performance by any of the Bidders.  Accordingly, the Debtors submit the assumption and assignment of the Assumed Contracts as set forth herein should be approved.

87.     To assist in the assumption, assignment, and sale of the Assumed Contracts, the Debtors also request the Sale Order approving the sale of the Assets provide that anti-assignment provisions in the Assumed Contracts shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

88.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . . .

11 U.S.C. § 365(f)(1).

89.     Section 365(f)(1) of the Bankruptcy Code, by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired

lease.  See Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.), 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"), cert. denied, 522 U.S. 1148 (1998).  Section 365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) of the Bankruptcy Code by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof.  See, e.g., In re Jamesway Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

90.    Other courts have recognized provisions that have the effect of restricting assignments cannot be enforced.  See In re Rickel Home Ctrs., Inc., 240 B.R. 826, 831 (D. Del. 1998).  Thus, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts, and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

91.    Orders granting motions to sell property and for the assumption and assignment of executory contracts frequently contain language explicitly stating the counterparty to the assumed contracts are barred from asserting against the debtor any default by reason of the closing, including any breach or right of termination relating to a change in control of the debtor.  See, e.g., In re Irish Bank Resolution Corp. Ltd., No. 13-12159 (CSS), 2014 WL 1759609, at *8 (Bankr. D. Del. Feb. 14, 2014) ("[n]o sections or provisions of the Contracts that purport to . . . declare a

breach or default as a result of a change in control in respect of the Debtor…shall have any force and effect, and such provisions constitute unenforceable anti-assignment provisions under 11 U.S.C. § 365(f) and/or are otherwise unenforceable under 11 U.S.C. § 365(e).").  The Debtors seeks such similar language here.

### D.    Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate

92.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request the Sale Order be effective immediately upon its entry by providing the 14-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

93.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay periods, the leading treatise on bankruptcy suggests the 14-day stay periods should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 Collier on Bankruptcy ¶ 6004.10 (15th rev. ed. 2006).  Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  Id.

94.     To maximize the value received from the Assets, the Debtors seek to close the Sale as soon as possible after the Sale Hearing.  Accordingly, the Debtors hereby request that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## NOTICE

95.     Notice of this Motion will be given to: (a) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Joseph Cudia and David L. Buchbinder; (b) the holders of the thirty (30) largest, non-insider unsecured claims against the Debtors; (c) counsel to the Stalking Horse Bidder, the DIP Facility Lender, and the Prepetition Secured Party; (d) any other parties with known secured claims against the Debtors or their counsel, if known; (e) all parties that have executed an NDA; (f) the United States Attorney's Offices for the District of Delaware and the Northern District of Illinois; (g) the Internal Revenue Service; (h) all state and local taxing authorities with an interest in the Assets; (i) the Attorneys General for the State of Delaware and the State of Illinois; (j) the Securities and Exchange Commission; (k) all other governmental agencies with an interest in the Sale and transactions proposed thereunder; (l) all other parties known or reasonably believed to have asserted an interest in the Assets; (m) the Assumed Contract Counterparties; (n) the Debtors' insurance carriers; (o) counsel to the Union; and (p) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

96.     In addition, copies of the Sale Notice, the Bid Procedures, and the Bid Procedures Order will be served on the applicable parties no later than two (2) business days after entry of the Bid Procedures Order by this Court.   In light of the nature of the relief requested herein, the Debtors submit no other or further notice is required.  A copy of the Motion, Sale Notice, the Bid Procedures, and the Bid Procedures Order also will be available on the website of the Debtors'

claims      and      noticing      agent,      Omni      Agent      Solutions,      located      at

https://omniagentsolutions.com/GoldStandard.

## **<u>NO PRIOR REQUEST</u>**

97.    No previous request for the relief sought herein has been made to this Court or any

other court.

*[Remainder of Page Intentionally Left Blank]*

10038374.v10

WHEREFORE, the Debtors respectfully request this Court: (i) enter the Bid Procedures Order, the form of which is attached as **Exhibit B** hereto, (ii) enter the Sale Order, the form of which is attached as **Exhibit C** hereto, and (iii) grant such other and further relief as is just and proper.

Dated:  June 22, 2022
Wilmington, Delaware

/s/  *Domenic E. Pacitti*

Domenic E. Pacitti (DE Bar No. 3989)
ichael W. Yurkewicz (DE Bar No. 4165)
Sally E. Veghte (DE Bar No. 4762)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
919 N. Market Street, Suite 1000
Wilmington, Delaware 19801
Telephone:    (302) 426-1189
Facsimile:    (302) 426-9193
Email:        dpacitti@klehr.com
              myurkewicz@klehr.com
              sveghte@klehr.com

-and-

Morton R. Branzburg (*pro hac vice* admission pending)
**KLEHR HARRISON HARVEY BRANZBURG LLP**
1835 Market Street, Suite 1400
Philadelphia, Pennsylvania 19103
Telephone:    (215) 569-3007
Facsimile:    (215) 568-6603
Email:        mbranzburg@klehr.com

*Proposed Counsel for the Debtors and Debtors in Possession*

10038374.v10